Liverpool & London & Globe Ins. Co. *v.* Hinton.

[77 South. 652.]

1. Insurance. *Renewal contracts. Presumptions.*
   A court of equity will compel the issuance and delivery of an insurance policy after loss, where there has been a valid agreement for one before the loss and will enforce its payment as if made in advance and this will be done though the contract was by parol.

2. Same.
   Where an authorized agent of an insurance company orally agreed to renew a policy, but nothing was said about any change in its terms or the amount of the premium the terms of the new policy will be presumed to be the same as those in the old policy.

3. Insurance. *Renewal. Terms.*
   Where there had been a change in the partners of an insurance agency, since the issuance of an original policy—but the agent who actually wrote the policy continued as a member of the firm in such case the insurance agency was fully advised as to to the old policy when it agreed to a renewal thereof and such renewal policy in the absence of agreement to the contrary will be without change of conditions and upon the same terms as the original policy.

4. Insurance. *Agents. Authority. Acts of company.*
   An agent who has authority to issue policies of fire insurance stands in the stead of the company, and his acts and declarations with reference thereto are the acts and declarations of the company, and the company is bound thereby.

5. Insurance. *Renewals. Premiums. Time due. Waiver.*

Where an insurance agency had not required advanced payments of premiums on two policies taken out previously by plaintiff, and he agreed orally for a renewal of one of them with a member of the agency who failed to demand payment of the premium at the time, and it was the custom of such agency to keep books and charge premiums for insurance and collect them when they desired. In such case by not demanding the premium when they agreed to renew the policy and by the course of dealing between the agency and plaintiff, the right to demand the premium before the issuance of the policy was waived.

6. Evidence. *Admissibility. Telephone conversations.*

In a suit to compel the issuance of a renewal policy in accordance with the terms of an alleged oral contract, the evidence of witnesses who heard what plaintiff said in a telephone conversation in regard to such renewal was competent.

7. Insurance. *Renewals. Contracts. Execution.*

A contract for the renewal of a fire policy becomes complete when an authorized agent of the insurer agrees to such renewal.

8. Insurance. *Renewals. Evidence. Materialty.*

Where one of the partners in an insurance agency knew of and acquiesced in a renewal by an employe of a fire policy, it was not material what conversations took place during the fire or afterwards, when plaintiff and defendant were looking for the insurance policy.

Appeal from the chancery court of Jasper county. Hon. G. C. Tann, Chancellor.

Bill by S. M. Hinton against the Liverpool & London & Globe Insurance Company. From a judgment for plaintiff, defendant appeals.

The facts are fully stated in the opinion of the court.

*McLaurin & Armistead* and *T. G. Birchett,* for appellant.

We will answer the appellee's brief by its headings. Appellee argues that the evidence is sufficient to show that the appellant Insurance Company made an agreement to extend appellant's insurance.

The counsel for appellee say that the essentials of the oral contract to insure are not necessary because they contend that this was an agreement to renew an existing policy. We repeat that the evidence shows nowhere that there was any agreement to renew. Neither Hinton, nor the Cheeks ever testified that Hinton ever identified himself in his telephone conversation to Reid. Reid said he never talked to Hinton. If Reid never understood he talked to Hinton, how could he have ever agreed to renew Hinton's policy? Their minds to create a contract must agree on that.

Surely, it cannot be contended that one can make a binding contract with a person, whom he did not know he was talking to. Appellee cannot dispute away this necessary element of understanding. Hinton remembered he knew Reid's voice, when he was again put on the stand, after he had already been examined and cross-examined. Reid testified he did ·not know Hinton's voice. The authorities cited in this connection by appellee are based on the assumption that Reid had agreed upon the renewal of the policy. This we contend that the proof does not show, and ask the court to read the record and compare Reid's testimony with that of Hinton and the Cheeks. Nowhere will it appear, that in the telephone conversation did Hinton make himself known to Reid, or Reid ever understand he ever talked to Hinton.

As to Reid's authority to make the promise to renew appellee's policy. The agents authorized by the appellant were Denison and Blankenship. Reid was a clerk in their office. He testified that Blankenship had instructed him not to renew the policy. But the record does not show that Reid ever agreed to renew the policy, or understood that same was renewed.

On page 15 of appellee's brief we find: ''The agency did issue the original policy to appellee.''

This is a departure from the record. The Jasper county insurance agency was composed of Joiner and Denison when the policy was issued. Joiner withdrew

and that agency was dissolved and a new one was formed which was in existence when the supposed renewal was claimed to be made. Therefore the insurance firm of Denison and Blankenship did not issue the 1910 policy, the only fire policy ever issued.

"The effect of the appellant's failure to pay the premium." This, it is admitted, was not paid. Appellee undertakes to claim a course of dealing, which warrants perpetual credit. The first and only fire policy was issued by Denison, who delivered it to Hinton and collected the premium from him by check.

The only other policy was the tornado policy issued to Hinton and kept at the bank; the only policy or paper kept at the bank. On record pages 57 and 58, we find Blankenship asking for the premium promptly, and Hinton paying same in cash and the premium was asked for and paid in cash, at a time, after Hinton claimed his fire policy was in force by agreement, Hinton's own testimony.

Does the prompt settlement of these two premiums show an extensive and long practise of credit? Blankenship and Denison both testified that they had no authority to charge any bank account with premiums and that was not the course of business. These transactions do not show that Blankenship and Denison handled premiums like merchants' accounts.

"As to the admission of the telephone conversation between the appellee and Reid." This we have fully discussed in our first brief. But again we say, nowhere does it appear that Hinton ever made himself known to Reid or Reid knew he was talking to Hinton, if he so talked which he denied. We again reiterate that there could be no renewal of Hinton's insurance by Reid unless Reid knew he was talking to Hinton. Hinton says he said: "Is that you, Reid?" He never made himself known to Reid, and neither he, Hinton, nor the Cheeks said he did so.

We submit that the evidence does not show a condition of facts to warrant the chancellor's finding.

We again respectfully submit, that this case should be reversed and judgment rendered here for the appellant.

*J. T. Brown* and *J. N. Flowers,* for appellee.

The evidence is sufficient to show that appellant Insurance Company, through its duly authorized agents, made an agreement to renew or to extend appellee's insurance.

The testimony of the appellee and of the appellant shows that appellee had only one policy of insurance and that a policy of insurance on the house and personal property issued by the appellant the Liverpool & London & Globe Insurance Company. And the testimony of the appellee is that it was this policy that the agent of appellee agreed to renew. There was no agreement about any additional insurance, or a different class of insurance or about a new policy in some other or different company. It was merely an agreement between Reid, the insurance agent, and appellee, to the effect that appellee's policy of insurance which expired on that particular day would be renewed.

Here we are dealing with a promise to renew an already existing policy. Its terms, character, benefits and obligations have already been agreed on and the controversy arises over an agreement or promise to renew this policy at the expiration of the period for which it was written.

"Here there was simply an agreement to renew an existing policy. The agreement would naturally mean that a similar policy was to be issued on May 6th, on the same tobacco insuring it for six hundred dollars for three months from that date." *Georgia Home Insurance Company* v. *Kelley,* 113 S. W. (Ky.) 882.

The Kentucky court in the above case had under consideration a controversy on all-fours with the case at bar.   *Mallette* v. *British American Insurance Company,* 91 Md. 471, 46 Atl. 1005; *Abel* v. *Phoenix Insurance Company,* 62 N. Y. Sup. 218; *American Central Insurance Company* v. *Hardin,* 148 Ky. 246, 146 S. W. 418; *King* v. *Kikla Insurance Company,* 58 Wis. 408, 17 N. W. 297; *Gold* v. *Insurance Company,* 73 Cal. 216, 14 Pac. 786; *Home Insurance Company* v. *Adler,* 71 Ala. 516; *Hawthorn* v. *German Alliance Company,* 181 Ill. App. 88; (An order to renew given over the telephone) *Worth* v. *Insurance Company,* 64 Mo. App. 583; *Post* v. *Aetna Insurance Co.,* 43 Bach (N. Y.) 351; *Baldwin* v. *Phoenix Insurance Company,* 107 Ky. 356, 54 S. W. 13, 92 Am. St. Rep. 362; *Commercial Insurance Company* v. *Morris,* 105 Ala. 498, 18 So. 34; 131 Ala. 711; 71 Ala. 516;—Ala. 163, 9 How. 405; 89 Tenn. 1, 14. S. W. 317.

In the case at bar we are not concerned with the proposition of whether or not there exists the essential elements to support a contract of insurance or to insure, or as it is often called, "an oral contract to insure." We are dealing with a case involving the agreement of appellant's agents to renew a policy of insurance.

"The very request to renew a policy implies that the new policy shall be exactly like and similar to the old." *Mallette* v. *Insurance Company, supra.*

When the agent agreed to renew the policy it placed the parties in the same attitude as though there had been a valid and binding contract to insure, upon the terms and conditions set forth in the old policy. When Reid agreed to renew appellee's policy, or promised to do so, it placed the insurance company in the same position it would have occupied had there been a valid agreement to insure and for the issuance of a policy on the exact same terms and conditions as to time,

amount of insurance, and property, as the old policy and this court has held that:

"It is well settled that a court of equity will compel the issuance and delivery of an insurance policy after loss where there has been a valid agreement for one before the loss and will enforce payment of it, as if made in advance." *Franklin Fire Ins. Co.* v. *Taylor*, 52 Miss. 441; *Abel* v. *Insurance Co.*, 62 N. Y. Supp. 218-219, 42 App. Div. 81.

"As to Reid's authority to make the promise to renew appellee's policy of Insurance." The Jasper county insurance agency was managed by Reid. He kept the books, made contracts of insurance, issued policies, signed policies and collected premiums.

"The powers of insurance agents to bind their companies are varied by the character of the functions they are employed to perform. An agent clothed with the authority to make contracts of insurance or to issue policies stands in the stead of the company to the assured. His acts and declarations in reference to such business are the acts and declarations of the company. The company is bound, not only by notice to such agent, but by anything said or done by him in relation to the contract or risk, either before or after the contract is made." *Rivara* v· *Insurance Company*, 62 Miss. 720; *London, etc., Insurance Company* v. *Sheffy*, 16 So. (Miss.) 307; *Insurance Company* v. *Bowdre*, 7 So. (Miss.) 596; *Home Insurance Company of New York* v. *Gibson*, 17 So. (Miss.) 13; *Insurance Company* v. *Randal*, 33 So. (Miss.) 500; *Insurance Company* v. *Bank*, 18 So. (Miss.) 931.

The effect of appellee's failure to pay the premium. Another feature of the case emphasized by counsel for appellant is the non-payment of the premium. Mr. Hinton would not testify that he had actually paid it. He was not certain but he did state that he had authorized the charging of the premium to his account at the

bank.  The men who ran the insurance agency also ran the bank.  Denison was president, Blankenship cashier, and Reid assistant cashier of the Bank of Bay Springs. These same gentlemen owned and ran the Jasper county insurance agency.  One building and one office housed both enterprises Hinton kept his money in the bank. The agents of appellant in their testimony admit that Hinton was solvent, and admit his ability to pay.  They admit their custom of giving credit for insurance premiums and presenting bills for past due premium accounts. Appellee stated that in the light of his instructions to charge the premium to his account and of his knowledge of their custom to present bills when payment was desired, the payment of the premium never crossed his mind.  He knew these insurance agents did business just as all such agencies do; that is, they issued policies without the cash payment of premiums and presented bills when payment was desired.  No bill was ever presented to him for the renewed policy and he naturally thought that it had been charged to his account at the bank.  The agents admit no demand and refusal to pay. The payment of the premium was not essential to the validity of the new policy in the light of these circumstances.  *Baldwin* v. *Phoenix Insurance Company,* 107 Ky. 356, 54 S. W. 13; *Post* v. *Aetna Insurance Company,* 43 Bach. (N. Y.) 35; *Hawthorn* v. *German Alliance Company,* 181 Ill. App. 88; *Briggs* v. *Collins,* 1915-A; L. R. A. (N. S. ) 686.

It overwhelmingly appears that the custom of the insurance agency was to handle its accounts just like a merchant handles his.  This custom was well known to appellee.  He had a right to rely on this custom and to act with reference to it.  See the cases of *Worth* v. *Insurance Company,* 64 Mo. App. 583; *American Insurance Company* v. *Hardin,* 146, S. W. (Ky.) 418; *King* v. *Insurance Company,* 17 N. W. (Wis.) 297; *Gold* v.

*Sun Insurance Company,* 81 N. W. (S. D.) 426; *Brown* v. *Insurance Company,* 108 Miss. 824; Elliott on Contracts, ch. 5, secs. 4133-4134.

As to the admission of the telephone conversation between appellee and Reid. Appellee testified that he went to the home of Mr. Cheek and asked permission to use the telephone in his house. In the presence of Mr. and Mrs. Cheek he says he called the bank and Mr. Reid answered the telephone. In the conversation that followed a contract of renewal was then and there consummated.

Mr. and Mrs. Cheek were both sworn and stated that they remembered the incident and heard appellee tell Reid that his insurance expired that day and that he wanted it renewed. They then heard him say: "I thought you would, but I wanted to make certain of it."

As stated by this court in the recent case of *St. Paul Fire & Marine Ins. Co.* v. *McQuaid,* 75, So. 257: "As to the law touching conversations over telephones: We think the law is well settled that such conversations are admissible in evidence. The fact that the voice at the telephone is not identified does not render the conversation inadmissible. The weight to be given such evidence is largely left to the jury, or to the chancellor, when the case is tried without a jury. "*Kent* v. *Cobb,* 133 Miss. 425; *McCarthy* v. *Peach,* 186 Mass. 67, 70 N. E. 1029; 1 Am. Ann. Cas. 801.

We submit that court was not only right in admitting the telephone conversation but was also right in permitting Mr. and Mrs. Cheek to tell what they heard of it. A contract of renewal or to renew could be made over the telephone just as well as it could be made any other way. The whole question, therefore, resolves itself into one of fact to be passed upon by the chancellor before whom the case was tried.

Much attention is devoted by counsel for appellant to the alleged wrongful admission of the testimony offered by the complainant, appellee here, as to the statements

of the appellant's agents subsequent to the telephone con-
versation and on the night of the fire.  We do not con-
tend and did not contend below, that these statements
were admissible against the London & Liverpool & Globe
Insurance Company as admissions. of the corporation.

It will be noted, however, that these agents were par-
ties defendant to this suit and certainly their admissions
as against themselves were competent.  *Commercial Fire
Insurance Company* v. *Morris,* 18 So. (Ala.)—.  We
submit that there is nothing' left for this court but to
affirm the case.

Sykes, J., delivered the opinion of the court.

The appellee, S. M. Hinton, filed a bill in the chancery
court of Jasper county against the appellant insurance
company, L. L. Denison and Clyde Blankenship.  The
bill alleges that complainant owned a one-story frame
building, which was his residence in the town of Bay
Springs; that in January, 1910, he procured from the
Jasper County Insurance Agency, a partnership com-
posed of the defendants Denson and Blankenship, an
insurance policy in the Liverpool & London & Globe
Insurance Company to the extent of one thousand
dollars insurance upon his dwelling and five hundred
dollars insurance upon his household furniture, the
insurance being for three years and expiring on January
21, 1913; that on the 21st day of January, 1913, the
complainant communinated  with the agents  of the insur-
ance company at their office in the Bank of Bay Springs,
and reminded them that this insurance policy had expired,
and told them that he wanted the policy renewed, and that
these agents assured him that it would be renewed, and
his property would continue to be protected by insur-
ance; that at a later period in discussing additional
insurance with them, they again told him that the one
thousand five hundred dollar policy had been renewed;
that he relied upon the agreements to renew and the

representations that his policy had in fact been renewed; that on June 18, 1914, his house was burned, and his household goods were damaged to the extent of two hundred dollars, making his total loss one thousand two hundred dollars. Complainant alleges that the renewal policy should have been issued to him as agreed upon between him and the agents of the company, and that it should be treated as having been issued; that the insurance company denied liability. Complainant prays in the bill that the defendant insurance company be required to issue him a policy renewing the contract which he had up until the 21st day of January, 1913; that the policy be issued, if necessary, as of that date for the term of three years; that the insurance company be held liable for the loss under the contract, or that, if the insurance company be held not liable, then that the said Denison and Blankenship be held liable for violating their contract with complainant to renew the policy. The first insurance policy is made an exhibit to the bill. It was issued for a term of three years. The premium therefor was thirty-six dollars. The answer of the insurance company admitted the issuance of the first policy, but denied that any renewal was ever agreed upon between its agents and complainant. The answer, in short, denies that any new policy was ever issued, or was ever agreed to be issued, to the complainant; denies that the agents did anything with reference to a renewal to bind the insurance company. The defndants Denson and Blankenship adopted the answer of the insurance company as theirs. The testimony introduced at the trial for the complainant showed the issuance of the first policy, the fire, and that his loss amounted to one thousand two hundred dollars in said fire. The complainant testified that on the evening of January 21, 1913, he went to the house of a neighbor, a Mr. Cheek, and with Mr. Cheek's permission used his telephone; that he telephoned the bank, and was answered by Mr. Reid, the assistant cashier of the bank. He stated that he told Mr. Reid

that his policy expired that day, and that he wanted
him to renew it; that he did not want to be without
insurance; that Mr. Reid assured him that he would do
so.  He further testified that Mr. Denison and Blanken-
ship, who were the president and cashier, respectively,
of the bank, were the insurance agents, and operated
under the name of the Jasper County Insurance Agency;
that he was assured by Mr. Reid that he would not let
his policy run out of date.  It was shown by the testi-
mony of Mr. Reid that the insurance business was han-
dled in the bank, and that he had the authority and did
as a matter of fact write the  policies and renewals for
the Jasper County Agency.  The complainant, Mr.
Hinton, further testified that, after the conversation
with Mr. Reid over the telephone about renewing his
insurance, and before the fire occurred, he had a con-
versation with Mr. Blankenship in the bank, and asked
him if he had attended to his insurance, and also asked
about taking out five hundred dollars additional insur-
ance.  He was informed in this conversation with Mr.
Blankenship that he had, in effect, at that time one
thousand five hundred dollars insurance, and he would
be allowed to take out five hundred dollars more; that this
conversation occurred about two months before the fire.
The testimony of the defendants contradicted that of
the complainant upon all material issues.  The thirty-six
dollar premium for the renewal policy was never paid
by Mr. Hinton, and the policy was never delivered to
him.  Mr. Hinton stated that he kept some of his papers
in the bank, among others a tornado policy, and that he
meant to leave this renewal policy also with the bank;
that no bill had ever been presented to him for the pay-
ment of the premium; that he would have paid it on the
presentation of the bill.  The testimony further shows
that the first policy was issued to him on January 21,
1910, and that the premium on that policy was paid on
February 3, 1910, a few weeks after it was issued.  The
testimony of one of the defendants shows that they

kept insurance accounts just as a merchant keeps accounts, and presented their bills for insurance when they were due. Since they deny that this policy was in force, there was, of course, no bill presented for the premium. The testimony is uncontradicted that Mr. Reid, the assistant cashier of the bank, had the authority to issue and renew insurance policies. The chancellor rendered a decree in favor of the complainant against the insurance company, ordering it to issue the policy prayed for in the bill, decreed that the amount due complainant under said policy was one thousand two hundred dollars, and credited the insurance company with the premium of thirty-six dollars. The bill was dismissed as to the defendants Denison and Blankenship.

The first contention of the appellant is that the evidence was insufficient to show that the appellant company, or any agent authorized to act for it, made any agreement to extend the insurance; that there was not a meeting of the minds of the insurer and the insured to consummate the agreement. The testimony in the record shows that Mr. Reid, with whom appellee had his telephonic conversation, was authorized to renow policies of insurance and to write them and sign the name of the Jasper County Insurance Agency. This testimony shows that he agreed to this renewal. The testimony of Mr. Hinton is also to the effect that Mr. Blankenship, one of the partners of this insurance agency, told him that this insurance was in effect. That there can be an oral contract to renew insurance is unquestioned. In this case the contract of renewal agreed upon was that the new policy to be issued would be for the same term of years as the old policy, viz. three years, would be for the same amount, viz. one thousand dollars on the dwelling and five hundred dollars on the furniture, and would be for the same premium, viz. thirty-six dollars. There was nothing said about any change in the terms of the policy or the

amount of premium to be paid therefor in the contract of agreement of renewal. This being true, it follows that the terms of the new policy were to be the same as those contained in the old policy. This is demonstrated by the below cited authorities:

"Here there was simply an agreement to renew an existing policy. The agreement would naturally mean that a similar policy was to be issued on May 6th on the same tobacco, insuring it for six hundred dollars for three months from that time." *Georgia Home Ins. Co.* v. *Kelley,* 113 S. W. (Ky.) 882.

"As to the objection that nothing was said as to the terms and conditions of renewal, we hold that, where there is an agreement for renewal of a policy, the insured is justified in assuming that the premium, and all the terms and conditions of the renewal, will be the same as those of the original, unless he has notice of some proposed change. This would hardly seem to need authority." *Mallette* v. *British American Ins. Co.,* 91 Md. 471, 46 Atl. 1005.

"According to his statement, the agreement then was to 'renew the insurance for one year.' His last insurance, had through this agent, was with the defendant company, and, by force of the term 'renew,' the company, as well as the property to be insured, and the terms of the policy, was sufficiently designated and agreed upon." *Abel* v. *Phoenix Ins. Co.,* 47 App. Div. 81, 62 N. Y. Supp. 218.

"Where, however, there exists a contract of insurance, . . . and there is an agreement between the parties to renew the policy, and no change is suggested or agreed upon, it will be implied that the renewal contract included and adopts all the provisions of the existing contract of insurance. Such a contract is complete in all respects, and upon failure to comply with the agreement, the party offending may be compelled, by bill in equity, specifically to perform the

agreement, or held liable in a court of law for damage resulting from a breach of the agreement (*Mobile Marine Dock and Mut. Ins. Co.* v. *McMillan & Sons,* 31 Ala. 711; *Home Ins. Co.* v. *Adler,* 71 Ala. 516; *Ala. Gold Life Ins. Co.* v. *Mayes,* 61 Ala. 163, 9 How. 405; *Lancaster Mills* v. *Merchants' Ins. Co.,* 89 Tenn. 1, 14 S. W. 317, 24 Am. St. Rep. 586), . . . and where the agreement was to renew an existing contract of insurance, it was proper and necessary to admit in evidence such existing contract of insurance." *Commercial Ins. Co.* v. *Morris,* 105 Ala. 498, 18 So. 34.

"The very request to renew a policy implies that the new policy shall be exactly like and similar to the old." *Mallette* v. *Ins. Co., supra.*

It has been decided by this court that a court of equity will compel the issuance and delivery of an insurance policy after loss where there has been a valid agreement for the issuance of same before loss:

"It is well settled that a court of equity will compel the issuance and delivery of an insurance policy after a loss, where there has been a valid agreement for one before the loss, and will enforce payment of it, as if made in advance. . . . This will be done where the contract was by parol, and even where the charter of the insurance company requires all policies to be in writing." *Franklin Fire Ins. Co.* v. *Taylor,* 52 Miss. 441.

The appellant also contends that there has been a change in one of the partners of the insurance agency since the issuance of the first policy, which is true. The testimony, however, shows that the agents of the company at the time they agreed to renew the same were fully informed as to the terms and conditions of the old policy. In fact, the agent who actually wrote the policy continued to be a member of the firm. It, therefore, follows that the insurance agency was fully ad-

vised as to the old policy when they agreed to a renewal of the same.

"Where plaintiff's last insurance was had ,with the defendant insurance company through the same agent, the word 'renew,' in an oral contract with such agent to renew the insurance, sufficiently designates the company, as well as the. property to be insured, and the terms of the policy." *Abel* v. *Ins. Co.*, 47 App. Div. 81, 62 N. Y. Supp. 218.

This court has uniformly held that an agent who has authority to issue policies of fire insurance stands in the stead of the company, and that his acts and declarations with reference thereto are the acts and declarations of the company, and that the company is bound thereby.

"The powers of insurance agents to bind their companies are varied by the character of. the functions they are employed to perform. . . . An . . . agent clothed with the authority to make contracts of insurance or to issue policies stands in the stead of the company to the assured. His acts and declarations in reference to such business are the acts and declarations of the company. The company is bound, not only by notice to such agent, but by anything said or done by him in relation to the contract or risk, either before or after the contract is made." *Rivara* v. *Ins. Co.*, 62 Miss. 720.

"The naked inquiry, then, is, Could the agent of the insurer waive the condition of the contract requiring consent for additional insurance to be made in writing indorsed on the policy? Or, to put it otherwise, Is the insurer estopped from claiming a forfeiture by the acts and conduct of its agents? . . . They represented and stood for the company. They received applications; they issued policies; they collected premiums; they received notice of other insurance,. and gave consent thereto—in general, they did for the company whatever it

116 Miss.—49

could do in the matter of making and continuing contracts of insurance. The company, being an artificial creature, could only act through human agencies, and what those agents did in this case, as indicated above, the company itself may be said to have done." *London etc., Ins. Co.* v. *Sheffy,* 71 Miss. 919, 16 So. 307. See, also, *Ins. Co.* v. *Wylie,* 110 Miss. 681; 70 So. 835.

It is further contended by the appellant that before the renewal contract became valid or enforceable it was necessary for the insured to pay the premium on said policy. The record in the case shows that the appellee did not pay the premium on the first policy until after it had been issued several weeks. It also shows that the same insurance agency did not require that he pay the premium on the tornado insurance policy which he carried with this agency at the time of its issuance, but that his attention was called to the premium being due one day when he was in the bank, and that he paid the same in cash. The testimony further shows that the insurance agency kept books and charged premiums for insurance, and collected them whenever they so desired. By not demanding the premium when they agreed to renew the policy, and by the course of dealing between this agency and appellee, the right to demand the premium before the issuance of the policy was waived. The testimony in this case shows that the appellee did a banking business with the bank of which the members of the insurance agency were respectively president and cashier, and that the insurance matters were handled by the officers of the bank.

"The actual payment of the premium before the risk attaches is not necessary unless such payment is made a condition precedent by the terms of the contract. This is not ordinarily done in cases of marine and fire insurance, but is customary in cases of life insurance. . . . The premium may be paid to the company or its duly authorized agent. Presumably it is payable in

cash, but if credit is given, it is equally as effective as cash. If there is no provision making the payment of the premium a condition precedent, it seems that the agent who negotiated the insurance may give credit for the premiums." Elliott on Contracts, vol. 5, secs. 4133, 4134.

See, also, *Post* v. *Aetna Ins. Co.*, 43 Barb. (N. Y.) 351; *Hawthorn* v. *Alliance Co.*, 181 Ill. App. 88; *Baldwin* v. *Phoenix Ins. Co.*, 107 Ky. 356, 54 S. W. 13, 92 Am. St. Rep. 362.

The telephonic conversation between the appellee and Mr. Reid was testified to by Mr. and Mrs. Cheek, who heard what appellee said in that conversation. This testimony was competent. In the late case of *St. Paul Fire & Marine Ins. Co.* v. *McQuaid*, 114 Miss. 430, 75 So. 257, this court said:

"As to the law touching conversations over telephones: We think the law is well settled that such conversations are admissible in evidence. The fact that the voice at the telephone is not identified does not render the conversation inadmissible. The weight to be given such evidence is largely. left to the jury, or to the chancellor, when the case is tried without a jury."

Similar testimony has been held to be admissible by the great weight of authority in this country.

"A telephone conversation between the parties, and upon the subject-matter of the litigation, having been testified to by one of the parties, may also be testified to by a bystander, so far as he heard it." *Kent* v. *Cobb*, 24 Colo. App. 264, 133 Pac. 424.

"The only question is whether a witness for the plaintiff properly was allowed to testify to what he heard the plaintiff say as a part of an alleged conversation with the defendant over the telephone, the plaintiff being in Boston and the defendant in Chelsea, and the witness being in the presence and hearing of the plaintiff. The witness had no personal knowledge with whom the plaintiff was talking, and did not hear anything

that was alleged to have been said by the defendant, and did not know that the defendant heard anything that the plaintiff said. . . . We think that the evidence was properly admitted. . . . The evidence that was admitted cannot be regarded as hearsay evidence or declarations made by the plaintiff in his own interest, simply because the witness did not know of his own knowledge that the other party to the alleged conversation was the defendant, or that there was any other party, or that the defendant heard what was said." *McCarty* v. *Peach,* 186 Mass. 67, 70 N. E. 1029, 1 Ann. Cas. 801.

The contract of renewal in this case became complete when Mr. Reid, who had authority to issue insurance and renew the same, agreed to renew this policy. The testimony of the complainant, which was believed by the chancellor, further shows that Mr. Blankenship, one of the partners in the insurance agency, knew of this renewal of Mr. Reid's and acquiesced in it. It is therefore immaterial as to what conversation took place during the fire or at the bank, after the fire, when they were searching for this insurance policy. For this reason we have not set out in detail this part of the testimony in the opinion.

The decree of the lower court is affirmed.

*Affirmed.*