CANAL INSURANCE COMPANY *v.* BUSH AND KING, d. b. a. BUSH AND KING TRUCKING COMPANY

No. 42635 June 3, 1963 154 So. 2d 111

*Satterfield, Shell, Williams & Buford, K. Hayes Callicutt*, Jackson, for appellant.

*O. B. Triplett,* Forest; *McFarland & McFarland,* Bay Springs, for appellees.

Lee, P. J.

James Bush and Eras King, partners, doing business as Bush and King Trucking Company, by their bill of complaint against Canal Insurance Company, a South Carolina corporation, doing business in this state, and Multiple Peril Underwriters, Inc., a Mississippi corporation, alleged that they obtained, about April 10, 1959, a liability insurance policy on motor vehicles from the defendants, and shortly thereafter and prior to May 14, 1959, the defendants agreed to extend the coverage of bodily injury, property damage, and automobile medical payments to include hired automobiles, the exact

premium charge being then undetermined, but to be subsequently made known upon the audit; that the complainants entered upon their contract, and, on November 10, 1959, one of their hired motor vehicles collided with another truck, driven by Joe Smith, Jr. in which vehicle Hugh Hillary Odom was a passenger; that complainants made prompt report thereof to the defendants; that the defendants engaged adjusters who investigated the accident and conducted negotiations toward a compromise, at no time giving the complainants any hint that they were not fully protected under their coverage; and that, after suits were filed on April 29, 1960, and the defendants were requested to defend, they refused to do so. As a result, complainants were required to employ their own attorney at a fee of $1,000 to defend said suits, which said attorney did successfully. The prayer of the bill was that their rights, under the contract should be established and that the defendants should be required to carry out the terms thereof. They also prayed for general relief. At the close of the evidence, they asked to amend their bill so as to extend specific relief to them by a decree in the amount of $1,000 to extinguish their obligation to the attorney whom they had employed, as heretofore stated.

The defendants filed a motion to dismiss, and special and general demurrers, setting up numerous grounds, all of which were overruled. After having obtained leave of the court, they then filed an answer, denying all of the material allegations of the bill and setting up therein certain legal defenses.

It appeared that James Bush and Eras King were partners, doing business under the trade name of Bush & King Trucking Company. They secured a contract job in Hancock County on account of which it was necessary to have protection against accidents. James Bush testified that he applied verbally to Paul T. Whitsett Insurance Agency in Jackson for a policy of in-

surance. One was written, numbered 349250, of date of April 10, 1959, running for a period of twelve months, with Canal Insurance Company and was received by mail from Whitsett, but not until either the last day of April or the first day of May. It was countersigned by Paul Whitsett as Authorized Representative of Multiple-Peril Underwriters, Inc. Five endorsements ''Countersigned and issued at Jackson, Miss., this 10th day of April 1959 by W. G. Thames, Authorized Agent, Multiple-Peril Underwriters, Inc.'' were attached to the body of the policy. Upon an inspection of the policy, Bush noticed that one of the endorsements was a fifty mile limit from the base of operations and another excluded hired car coverage. On May 2, 1959, he wrote Whitsett asking for (1) the correction of an erroneously included vehicle, (2) on account of his office being at Taylorsville and the work in Hancock County, the radius would have to be extended accordingly, and (3) ''about the protection we have for the trucks we hire at different times or the comprehensive liability that we had on one of the old policies. Please check this and let me know.'' After the receipt of this letter, Whitsett talked to Bush over the telephone and agreed to extend the radius of operation and write the hired car insurance. The estimated cost of the premium was agreed upon. He accepted the rate and told Whitsett it was satisfactory. After this agreement that they were covered for hired cars Bush said there was no further agreement. Confirming this telephone conversation and agreement, Bush received a letter from Whitsett, dated May 14, 1959, in which he said: ''In quoting to you the rate of $1.50 per $100 for the hired automobile endorsement, I quoted the rate on base limits rather than the increased limits effective in your policy. Because of this error, the premium I gave you is obviously low but in an effort to keep the additional premium as low as possible, I am reporting to the company an estimated hired car

cost of some $17,000 rather than the $20,000 you and I had agreed upon. As stated to you over the phone, if your cost runs above this figure, the adjustment can be made on audit. As soon as we have heard from the company as to the exact premium charge for this amendment, I will let you know. *Enclosed herewith is a current statement which does not include the additional premium to be charged on the hired car amendment.*" (Emphasis supplied.) The bill, referred to, was promptly paid. All endorsements came to the partnership from Paul T. Whitsett Insurance Agency and all premiums were paid to him as soon as bills were received. Subsequently the radius of operation was extended to one hundred and fifty miles by endorsement for the life of the policy "Countersigned and issued at Jackson, Miss., this 29th day of July 1959 By W. G. Thames, Authorized Agent, Multiple-Peril Underwriters, Inc."

About November 10, 1959, a truck, owned by Mrs. Fleming, and hired by the partners, was in collision with another vehicle, driven by Joe Smith, Jr., in which Hugh Hillary Odom was a passenger. Bush reported the accident to Whitsett. Without question, adjusters in the employ of Canal Insurance Company began investigating the case. Sometime in December 1959, he received from Canal Insurance Company a hired car endorsement, dated December 10, 1959, to be annexed to the policy, running for the term of the policy. It was not until May 23, 1960, that notice was received from the Insurance Company of denial of liability on its part. After the suits were filed, when the defendants refused to defend the suits, the partners necessarily were required to employ an attorney. They therefore employed Hon. O. B. Triplett, Jr. of Forest, Mississippi, to represent them in the suits for an agreed fee of $1,000. He was successful in having the cases dismissed.

Paul B. Whitsett testified that he operated a business known as Whitsett Insurance Agency in Jackson, Mis-

sissippi, handling all lines of insurance. James Bush requested insurance to protect the partners on a contract that they had secured in Hancock County. As he did not have a company of his own through which this insurance could be handled, he contacted Multiple Peril Underwriters, Inc. to secure the insurance on an agreed basis that he was to get a ten percent commission. His discussions were largely with W. G. Thames, President of the corporation. Multiple sent the policy of insurance to him for delivery. The coverage was written by Canal Insurance Company. He complied with the instructions, made delivery, sent a bill to Bush & King, and collected the premium later. Immediately after examining the policy, Bush, by letter, raised the question that it did not provide certain needed coverage, namely, at lease a one hundred and fifty mile radius of operation and hired car coverage. Following this conversation, the witness contacted W. G. Thames and told him that Bush had pointed out that the policy had the limited radius of fifty miles, and did not cover hired cars, and that he needed this protection. Thames agreed to extend the radius and gave him the $1.50 per $100 on a basis of $17,000. He then called Bush and told him that the radius would be extended and what the rate would be and Bush said ''We will have to have it and we want it.'' Whitsett then wrote the letter of confirmation of May 14th to Bush, of Bush & King. He did not receive a billing from Multiple-Peril on an invoice to cover a premium of $262.20 on this hired car coverage until December 20, 1959. When he submitted it to Bush & King, the same was promptly paid, as usual. The witness said that the endorsement, in effect, showed that the premium was based on a twelve month estimate; that rates for such insurance are based on the hired car cost, and not merely the time to run; and that the premium of $262.20 could be no part of a multiple, based on time, of a rate of $5.61 per $100 on

$17,000, as attempted to be claimed by the insurance company. When he was notified about the accident, he reported it through Multiple. When he first heard that a question had arisen as to hired car coverage, he talked to Thames, who appeared to be uncertain. The witness reminded him of their conversation and the fact that he first quoted an erroneous premium and subsequently corrected the rates and the coverage was corrected and supposed to be there. Thames then stated that he recalled the situation and he was sure that the endorsement had been forwarded from his home office and that someone had evidently slipped up on it. He stated positively that he had ordered it from the home office and that someone there had slipped up on it. He said that he would attend to it immediately and would issue an endorsement giving the hired car coverage. When the witness asked if the endorsement would be retroactive, Thames replied that it would be because it was supposed to have been there originally, and the endorsement would provide coverage for that period of time. He testified that the hired car endorsement was to have been issued in May 1959 and that the rate of $1.50 per $100, if found too low, would be revised later. According to their practice, Multiple sent billings for the premiums, he made remittances to them and transmitted the billing to the customer and the customer sent the check to him, and in turn, he remitted to Multiple, less his ten percent.

On being recalled for further examination, Whitsett was asked why he signed his name on the original policy above the typewritten signature of Multiple Peril Underwriters, Inc., and he replied that, when he wrote his name, he assumed that, since the space had been left blank, it was the intention of Multiple Peril for him to sign his name as their representative on the policy, and that is what he did.

Grayson B. Keaton, an attorney representing Joe Smith, Jr. in his claim against Bush & King Trucking Company, testified that an adjusting agency corresponded with him about the claim and requested certain information which he furnished. Finally, after some negotiations, the Insurance Company denied liability and the adjuster, with whom he had been trying to negotiate a compromise settlement, advised that the defendants were not covered by insurance. The witness knew Hon. O. B. Triplett, Jr. who represented Bush & King in the Smith case and also in the Odom case against the same defendants, and in his opinion, a reasonable fee for services such as were rendered by Mr. Triplett, was $1,500 to $2,000 and that $1,000 would be very reasonable indeed.

William G. Thames testified as a witness for the defendants. He had begun working for Multiple in December 1958 and had continued in their employ until February 1960. He identified the policy which was involved in this controversy. He confirmed Whitsett's statement about how he came to acquire this business. He said, however, that the premium for it was received, he sent it to Canal, and that the Company wrote the policy and sent it to him for delivery; that all of the endorsements, dated April 10, 1959, were attached to the policy at the time of delivery; and that other endorsements, shown as exhibits to the policy, were requested and obtained on the date shown by them. He admitted that Whitsett contacted him in May with reference to the extension of the radius of operation to one hundred and fifty miles and inquired about obtaining an endorsement for hired trucks. He obtained the information as to rates from Canal by telephone and quoted this rate to Thames, but he said that nothing happened until after the accident, and this was the first or second week in December. He said that the rate for such insurance was $5.61 per $100, and no money

was tendered for the time intervening between May and December. He said that his company was a mere soliciting agent. While he had a typewritten contract with the company on behalf of Multiple, it was not then in his possession. On cross-examination, he admitted that when Whitsett talked to him about the insurance, the agreement was that Whitsett was to get ten percent of the premium. While he was working with Canal, he collected over $200,000 worth of premiums. The Company supplied him with forms and these were kept in Multiple's office. Then he stated that Canal wrote the policies and endorsements in the home office; but sometime about June 1, 1959, Multiple began doing its own work. While saying in one instance that he collected premiums before he asked the Company to write the policies, he admitted that in some cases the Company allowed him to prepare and send out an endorsement if he had enough money to get the return premium out of it. He admitted that this was an oral application and that Whitsett had told him that the applicants needed the insurance. While maintaining that Canal filled out the policies and sent them to Multiple with the name typewritten at the bottom, he finally equivocated by saying "I don't know whether it was written by them or not. They wrote the policy." He denied that he agreed to see that the endorsement was issued and made retroactive, and replied that "I told him that I would talk to the Company about it * * * to see if they would." In other words, the version of this witness was in all substantial particulars in dispute with the statements of Whitsett.

After the defendants rested, Paul Whitsett was recalled in rebuttal and he stated that he had no recollection whatever of Thames having said that he quoted a rate of $5.60 per $100 for the hired car coverage. He reiterated that the partnership did not have the coverage and that they needed it. On the other hand, Thames

said that the rate would be $1.50 per $100 for this cost, and Bush, when he reported to him, said "We will have to have it and we want it." The basic figure given to Bush was $1.50 per $100 with the possibility that the new premium might be higher when the exact rate should be obtained.

The motion of Multiple Peril to dismiss as to it was sustained. The chancellor also made a detailed finding of the facts in writing and awarded the relief as prayed for in the bill of complaint. From a decree in accordance with the findings, Canal Insurance Company appealed.

The burden of the argument of the appellant, under its assignments, is that Multiple Peril was a mere soliciting agent, and as such, it could not, by parol endorsement, extend coverage to hired trucks and thereby waive or change the written provisions of the policy; and that the doctrine of waiver and estoppel cannot be used to extend the coverage of an insurance policy or create a prime liability. Counsel cite an abundance of authorities to support the general principles by which they contend that this cause is governed.

On the contrary, the appellees contend that Multiple Peril was a general agent of the appellant, and they cite cases to show the authority and powers of such an agent.

In the early case of Rivara v. Queen's Insurance Co., 62 Miss. 720 (1885), in holding that one of the disputed issues, namely, whether the agent who issued the policy sued on had authority to take risks and issue policies without forwarding applications to his company, the Court announced the following principles: "The powers of insurance agents to bind their companies are varied by the character of the functions they are employed to perform. Their powers in this respect may be limited by the companies, but parties dealing with them as to matters within the real or apparent scope

of their agency are not affected by such limitations unless they had notice of the same. *An insurance agent clothed with authority to make contracts of insurance or to issue policies stands in the stead of the company to the assured.* His acts and declarations in reference to such business are the acts and declarations of the company. The company is 'bound, not only by notice to such agent, but by anything said or done by him in relation to the contract or risk, either before or after the contract is made'', citing authorities. (Emphasis supplied.)

In the case of Liverpool & London & Globe Ins. Company v. Hinton, 116 Miss. 754, 77 So. 652 (1917), the complainant, on January 21, 1913, reminded the insurance agent that his fire policy on the house for $1,500 had expired and he wanted it renewed. The agent assured him that it would be renewed, and later told him that it had been. The house was burned June 18, 1914 — nearly seventeen months later — *and the premium had not been paid, and the policy had not been delivered,* although he would have paid for it, if he had been billed. The opinion held that the chancellor was justified, on the conflicting evidence, in believing that the contract of renewal became complete when the agent, who had authority to issue and renew the same, orally agreed to do so, and reaffirmed the principle which was laid down in Rivara v. Queen's Ins. Co., supra, as set out in the above excerpt from the opinion in that case.

In Liverpool & London & Globe Ins. Company v. Delaney, 190 Miss. 404, 200 So. 440 (1941), a local agent of the appellant, to whom it supplied blank policies to be filled up, countersigned and issued by him, without referring applications to it, had issued to Mrs. Delaney, on a verbal application, the fire policy on which this suit was brought. Mrs. Delaney's husband made the application and told the local agent there was an out-

standing policy covering the house. This was disputed by the evidence for the insurance company. The opinion said: "If Delaney advised Stewart of the existence of this other insurance policy on the house here insured, which was for the determination of the jury, the stipulation in the policy that it would be void if the house covered by it was or would become covered by another insurance policy was waived, by his issuing the policy notwithstanding stipulations to the contrary therein. This Court has many times held in accord with the weight of authority elsewhere, — that *a local agent of an insurance company who is furnished·by it with blank policies to be filled up, countersigned and issued by him has all the powers of a general agent of a company when issuing such policies and may waive any of their provisions.* Saucier v. Life & Casualty Ins. Co., 189 Miss. 693, 198 So. 625, relied on by counsel for the appellant, deals, in this connection, only with the effect of Section 5196, Code of 1930, on the authority of special agents of an insurance company, and has no application here." (Emphasis supplied.)

In Buffalo Ins. Co. of New York v. Borden, 211 Miss. 47, 50 So. 2d 895 (1951), the evidence for the appellee was to the effect that she told the local agent of the appellant, when he solicited her insurance, that she already had with another agency a $1,000 policy, which was just enough to pay her indebtedness to the bank; that after the agent advised her that she did not have enough insurance, she told him that, as soon as she could, she would take out a policy with him; that he said "fine"; that six or eight months later she called the agent on the telephone, told him she was ready for another policy, and ascertained the amount of the premium on $2,000; and that later she sent her father with the premium money to pick up the policy, and he brought it to her. The agent denied the telephone conversation, but did not deny the alleged conversation with her six

or eight months before. The alleged conversation be-
tween the appellee's father and the agent at the time
of the issuance of the policy concerning other insurance
was in sharp dispute. In response to the appellant's
contention that it was entitled to a peremptory instruc-
tion on the ground that the provisions of the policy
were violated in that there was other insurance on the
house, the Court said: ''The evidence in this case shows
that Smith, as the general agent for appellant, issued
this policy on a verbal application therefor, and under
the law he could waive any of the provisions of the
policy. The only question presented here for decision
is whether or not the appellee told Smith that she had
another policy on her home in the amount of $1,000. We
are of the opinion that this presented a question for
the jury.'' The opinion cited Liverpool and London &
Globe Ins. Company v. Delaney, supra, and quoted an
excerpt from the opinion. The following is a part of
that excerpt: ''This Court has many times held in
accord with the weight of authority elsewhere, — that
a local agent of an insurance company who is furnished
by it with blank policies to be filled up, countersigned
and issued by him has all the powers of a general agent
of a company when issuing such policies and may waive
any of their provisions.''

In Camden Fire Ins. Ass'n v. Koch, 216 Miss. 576,
63 So. 2d 103 (1953), after Koch purchased the prop-
erty, which was insured, he went to the insurance agent,
reported his purchase and asked for a notation of the
change in ownership. The agent said that he would
attend to it. Later, Koch's representative went to the
insurance office and was told that the papers had been
sent off. These two witnesses testified accordingly.
The insurance agent denied these conversations and said
that he had never heard of the change. The opinion
stated that recovery would necessarily have to be based
on the conversations which appellee claimed that he had

with the general agent prior to the loss, as working an estoppel against the appellant to deny that the purchaser of the property was protected at the time of the loss. It cited Liverpool & London & Globe Ins. Company v. Delaney, supra, and Lititz Mutual Ins. Company v. Miller, 210 Miss. 548. 50 So. 2d 221, on that question. The opinion also quoted Sec. 5706, Code of 1942, and explained that it means substantially that the agent of a foreign insurance company, who is the sole medium through whom his principal deals and who has authority to fill out, sign and deliver a policy, has all the powers of a general agent of the company while so doing, and may waive any of the policy provisions. While conceding that, under appellant's argument, the statute might not be applicable as between the insurer and insured as to consummated contracts, yet, in the case there under consideration, the appellee was in the status of an original applicant, who was assured that the insurance, which he sought, would protect him, and that there was therefore an agreement between the parties for the existing policies to be changed in order to conform to the change in ownership.

Other authorities of like force and effect might be cited.

■■ ■ The Court must determine, from the authorities, the nature and extent of Multiple Peril's agency for the appellant.

It must be remembered that (1) Multiple Peril handled a large amount of business for Canal; that Thames admitted that (2) Canal supplied the forms for this business and that they were kept in Multiple's office, "That is true in this case", although he had earlier claimed that the policy and all of the endorsements had been filled out at the home office of the company; that yet (3) "Sometime after June 1st" they did all of their work and policy writing; that (4) the policy itself was countersigned by Multiple Peril's agent; that

(5) the five endorsements, which were attached to the body of the policy, were all "countersigned and issued at Jackson, Miss. this 10th day of April, 1959 by W. G. Thames, Authorized Agent, Multiple-Peril Underwriters, Inc."; that (6) the increased radius of operation endorsement, which the agents of Multiple Peril agreed to issue in May 1959 was "Countersigned and issued at Jackson, Miss. this 29th day of July, 1959, by W. G. Thames, Authorized Agent, Multiple-Peril Underwriters, Inc."; that (7) several other subsequent endorsements, using like verbiage of issuance, and signed by Multiple Peril by its agent, as above, were attached to this policy; that (8) the application for the insurance was oral; that (9) the agents of Multiple Peril were the only representatives through whom appellees were required to deal; that (10) the contract of insurance had not been fully consummated at the time when the agents of the insurance company agreed to provide hired car coverage — and when these potent factors are remembered and all of the facts are viewed in the light of the foregoing applicable authorities, it is clear that Multiple Peril Underwriters, Inc. was fully authorized to enter into a valid contract for this coverage.

 The validity of oral contracts with an insurance company is challenged. However, as early as 1876, this Court had occasion to pass upon that question. Franklin Fire Ins. Company v. Taylor, 52 Miss. 441, was a suit to compel the delivery of an insurance policy against loss by fire and for the payment of the amount due, the house having been burned. The evidence was in dispute as to whether the contract for this purpose had been completed before the loss. The chancellor determined the question in behalf of the insured. The opinion said: "It is well settled that a court of equity will compel the issuance and delivery of an insurance policy after a loss, where there has been a valid agreement for one before the loss, and will enforce payment

of it, as if made in advance. This will be done where the contract was by parol, and even where the charter of the insurance company requires all policies to be in writing," citing authorities.

Moreover, in Liverpool & London & Globe Ins. Company v. Hinton, 116 Miss. 754, 77 So. 652, the appellee sought to require the insurance company to issue him a policy renewing the contract which he had until January 21, 1913, and that the policy be issued, if necessary, as of that date for the term of three years, and that the insurance company be held liable for the loss under the contract. The decree ordered the issuance of the policy, as prayed for, determined the amount due the complainant under the policy to be $1,200, and credited the insurance company with the premium of $36. That decree was affirmed by this Court. The opinion said "That there can be an oral contract to renew insurance is unquestioned."

In New England Ins. Company v. Cummings, 164 F. Supp. 553 (1958), a Mississippi case, Cummings testified that he telephoned the local general agent of the insurance company and told him he wanted $9,000 insurance on the contents of his restaurant, and that the agent informed him that he would issue a policy. His deposition was also in these words: "Let's put it this way. He told me I was covered for $9,000." The agent's statement was: "I told him I was going to provide him coverage." No policy was actually issued although the agent had signed, but not delivered, a Memorandum of Insurance underneath which was typed "Insurance Binder" for an unspecified amount of insurance in appellant company on a building of Mr. Cummings on Highway 49 W; Yazoo City, Mississippi. No rate was given nor premium paid. The issue was submitted to the jury and it found for the appellee. Under a motion to set aside the verdict and grant a judgment notwithstanding, Judge Mize held that the company was under

a valid agreement and obligated to bear the loss unless it was voided by some subsequent act of the insured. He came to this conclusion for the following reasons: Under Section 5706, Code of 1942, and Camden Fire Ins. Ass'n v. Koch, 216 Miss. 576, 63 So. 2d 103, an agent with the authority to write and deliver policies is a general agent and may waive any provisions of the policy; it was not necessary either that the premium be paid or the policy be actually delivered to the insured before the contract became effective, citing Scottish Union & National Ins. Company v. Warren Gee Lumber Co., 118 Miss. 740, 80 So. 9; and although the so-called binder had not been delivered, this fact did not prevent it from becoming effective, citing Connecticut Fire Ins. Company v. Harrison, 173 Miss. 84, 161 So. 459. However, because of an increase in hazard, as the judge thought, he granted the motion. On appeal to the Circuit Court of Appeals, styled Cummings v. New England Ins. Company, 266 F. 2d 888, that Court concurred with the trial judge in all of his conclusions, as stated above, and mentioned besides Rivara v. Queen's Ins. Co., 62 Miss. 720. However, the appellate court held that the trial judge was in error in entering judgment for the insurance company notwithstanding the verdict of the jury. It therefore reversed the judgment and remanded the case to the trial court for the entry of the judgment on the verdict of the jury.

Consequently the Court is of the opinion that the oral contract in this case, if made, is enforceable.

The Court is next concerned with the relationship between Whitsett and Multiple Peril.

██ █ Multiple Peril Underwriters, Inc. was the authorized agent and representative of Canal Insurance Company. W. G. Thames was its President. When Paul Whitsett received Bush and King Trucking Company's request for insurance, and he did not have a suitable line of his own, he engaged Multiple Peril to obtain

the insurance with the agreement that he and Multiple Peril would divide the commission accordingly between them. He conducted all negotiations with Bush and was the agent of Multiple Peril, the agent of Canal, the insurer in this transaction. This principle has been fully settled and determined in Bankers Fire & Marine Ins. Company v. Dungan, 240 Miss. 691, 128 So. 2d 544. See the authorities there cited.

In regard to the oral contract, the trier of fact, on the disputed issue, had ample evidence to warrant a finding that such contracts for hired car coverage had been entered into between the appellees and the appellant's agents in May 1959, and that it remained in effect until December 10, 1959, when a written endorsement, embodying the terms of the agreement, except for the effective date, was issued as a part of the policy. This was the situation: Bush orally applied to Whitsett for the insurance because of the hauling contract of the partnership with the Highway Department. Whitsett, not having a suitable line of insurance himself, procured the policy through Multiple Peril. But, as soon as Bush received the policy, he found that it was not what he was trying to buy. With its limited radius of operation, he actually would have no protection whatever in the performance of the contract, and, even though the radius were extended, he would be without hired car coverage. He would have been foolish indeed to purchase such an insurance policy under the circumstances in this case. By letter, he immediately called these matters and an error to Whitsett's attention, and the letter shows that he did not send his check to cover the bill which had been enclosed with the policy. Unknown to Bush, Whitsett and Thames of Multiple Peril, who had become associates in writing this insurance, colloborated about the matter, with the result that Whitsett called Bush over the telephone, told him that the radius would be extended, and that the hired car cov-

erage would be written. He also advised the approximate cost. Bush in turn told Whitsett that he needed the insurance and would have to have it. Following this conversation, Whitsett sent his letter of confirmation of May 14th, in which he said expressly that, as soon as he received the exact premium from the company for the hired car amendment, he would let Bush know. This, of course, meant so that Bush could pay for it. Besides, Whitsett, in that letter, advised that he was sending a current statement "which does not include the additional premium to be charged on the hired car amendment." Bush evidently felt that his partnership was protected. One of the hired trucks later had a wreck. He reported, in a reasonable time, the facts fully to Whitsett, and the insurance company had the matter elaborately investigated over a long period of time; and it was without any clue whatever to him when the insurance company unexpectedly signified its determination to topple him from his citadel of safety. Sometime in December 1959, the company had sent him an endorsement for hired car coverage, effective from December 10, 1959, for the balance of the twelve-month period. The amount which he paid was $262.20, which, the evidence justified the chancellor in finding, was the cost for such insurance to be effective in May for the balance of the life of the policy. The oral contract was fully established by the evidence of Bush, Whitsett and the several written communications.

On its contention that Multiple Peril had no authority to agree to provide the coverage here in question, the appellant, from the many authorities cited, seems to place great reliance on Mutual Liability Ins. Company of New York v. Hebron, 166 Miss. 145, 146 So. 445; Travelers' Fire Ins. Company v. Price, 169 Miss. 531, 152 So. 889; Aetna Ins. Company v. Singleton, 174 Miss. 556, 164 So. 13; Saucier v. Life and Casualty Insurance of Tennessee, 189 Miss. 693, 198 So. 625; and

American National Insurance Company v. Walters, 230 Miss. 616, 93 So. 2d 616. In each of the first four cases, the Court said that the alleged representatives of the companies were mere soliciting agents. In the Walters case, Judge Kyle, writing the opinion for the Court, said that "A general agent ordinarily has authority to waive a ground for avoidance of forfeiture of an insurance policy. But it was not shown that Waller was a general agent of the company. A mere collecting agent has no power to modify a contract of insurance, or to waive a forfeiture." Besides, the opinion showed that there was no evidence that Waller, the alleged agent, had any authority to issue policies, or make any contract of insurance, or change or modify them, or that there was any such custom.

Neither can the principle, found in such cases as Maryland Casualty Company v. Adams, 159 Miss. 88, 131 So. 544, or Hartford Accident & Indemnity Company v. Lockard, 239 Miss. 644, 124 So. 2d 849, apply. Although in the Adams case, the agent had represented that a policy would be issued to cover the risk as desired, the policy, when issued and accepted, did not do so. There was no complaint about it until four months later, after the accident had occurred; and under such circumstances, coverage could not be extended. In the Lockard case, the situation was very similar, as to representations. But the policy, when issued and delivered, contained an express exclusion against liability on account of the trailer, and nothing had been done about changing this provision after the policy had been delivered and accepted. There could be no extension of coverage by implication.

The opinion will not be prolonged for the purpose of distinguishing each and every case. Factual situations determine the application of general principles; and when those situations differ in material points,

obviously the general principles to be applied are different.

From which it follows that the decree of the trial court must be affirmed.

Affirmed.

*McGehee, C. J., and Arrington, McElroy, Rodgers and Jones, JJ.*, concur.

GILLESPIE, J., dissenting:

I respectfully dissent:

### 1.

Oral contracts of insurance are valid, but I am of the opinion that when the evidence in this case is viewed in the light most favorable to appellees (insured), and assuming the agency of Whitsett, no oral contract was ever consummated.

In considering whether the evidence established an oral contract to extend the coverage of the policy to hired trucks, the law concerning oral contracts of insurance must be considered.

In 29 AM. JUR., Insurance, Sec. 1922, the text is as follows: ''Since oral contract of insurance, although generally held to be valid apart from the provisions of statute or the charter of the insurance company, are rarely made, and are outside the ordinary course of business, such a contract must be established by clear and convincing evidence, full and clear proof, etc., and it must be shown that each party understood its terms in the same light. Evidence which shows merely an incomplete, indefinite, conditional, and tenative arrangement for insurance is insufficient to establish a valid oral contract.''

The authorities seem to be unanimous in holding that oral contracts of insurance must be established by clear and convincing evidence or, as sometimes stated, by full and clear proof. 15 A.L.R. 1004; 69 A.L.R. 565;

92 A.L.R. 236. Our own Court is in accord. American Bankers Ins. Co. v. Lee, 161 Miss. 85, 134 So. 836. Thus we find that an oral contract of insurance must be established with the same clarity and as convincingly as required to establish fraud, and that ''an incomplete, indefinite, conditional, and tentative arrangement for insurance is insufficient to establish a valid oral contract.''

In determining whether the evidence established an oral contract to cover the hired trucks the court should also consider why the courts have upheld the validity of oral contracts of insurance and what are the situations giving rise to valid oral contracts in this field.

Most of the cases upholding the validity of parol contracts of insurance involve either (1) a contract for temporary or preliminary insurance until the formal policy can be written, or (2) renewal of an existing policy. The first category is aptly illustrated by the case cited in the majority opinion, New England Ins. Co. v. Cummings, 164 F. Supp. 553, a Mississippi case, where the proof showed that the agent told the insured as follows: ''He told me I was covered for $9,000.'' In that case the agent undertook and did provide coverage effective *in praesenti,* not in the future. The second category is aptly illustrated by another case cited by the majority, Liverpool & London & Globe Ins. Co. v. Hinton, 116 Miss. 754, 77 So. 652, in which case the proof showed that the agent assured the insured that his property would continue to be protected. Insured had a policy already and requested its renewal. Later, the agent told insured the policy had been renewed. In that case the proof was directly to the point that the insurance was in force and the property covered. No case has been cited, and I have not found one, where an oral contract was held valid to extend the coverage of an existing policy so as to bring in property or coverage not provided by the existing policy. Our recent

cases say this cannot be done, and this will be shown in another part of this dissent.

One other matter should be considered in measuring the evidence by the law to determine if a parol contract for additional coverage was established by clear and convincing proof. The appellee, Bush and King, is a partnership composed of James Bush and Eras King. It is a contracting firm. Eras King seems to be the operating partner but James Bush looked after the insurance matters. Mr. Bush is obviously an educated man. He is a banker and hotel owner. His testimony showed that he is intimately familiar with insurance policies and that he read the policy in question and every endorsement thereon. He never testified that Whitsett told him the coverage was in force as to the hired trucks. The testimony merely showed that he "needed and wanted" or "had to have" the hired truck coverage, but in the letter from Whitsett to Bush and King, dated May 14, 1959, which seems to have been the last communication between them regarding the hired truck coverage, it is said: "As soon as we have heard from the company as to the exact premium charge for this amendment, I will let you know." He enclosed a bill which did not include any premium for the hired truck "amendment." Mr. Bush, who carefully read every endorsement to the policy, never received any amendment or endorsement providing coverage on hired trucks or bill for the premium for such coverage until a month after the accident involving a hired truck. The endorsement was issued effective December 10, 1959, while the loss had occurred on November 10, 1959.

The policy in question covered 34 vehicles, mostly trucks, all of which were described therein by name and motor number. Bush had kept that policy and received several endorsements which were added from time to time, one changing the operating radius, from the time he received it about May 1, 1959 until November 10,

1959, when the accident occurred involving a hired truck. When the accident occurred to the hired truck on November 10, 1959, Mr. Bush had had possession of the policy issued by appellant for about six months. By his own testimony, he had carefully read this policy, together with all endorsements thereon. Therefore, he knew that he did not have any coverage on the hired trucks as far as the policy was concerned. Moreover, he did not report the accident involving the hired truck until after he discovered the hired truck owner had only collision insurance and had not provided liability coverage. Bush frankly so stated in his letter reporting the accident. The inference is very strong, in fact, -almost compelling, that since Bush knew he did not have hired truck coverage he received assurances from the lessors of such trucks that they were covered by insurance, and that appellees were depending on protection from that source rather than from the policy issued by appellant. That seems to be the reason the accident of November 10, 1959 was not reported to Whitsett until after appellees discovered that the hired truck owner had failed to provide liability coverage.

I find no clear and convincing evidence that the parties ever entered into any oral contract for hired truck coverage. Nothing showed the parties understood the coverage was provided *in praesenti*. They merely talked about such coverage. I cannot agree with the majority when the inference is forced that "Bush evidently felt that his partnership was protected." In my opinion, there was nothing more than an "incomplete, indefinite, and tentative arrangement" to provide coverage of the hired trucks. There was no consummation. There was no common assent. No one told Bush and King that the coverage was in force, nor were they justified in believing such coverage had been provided. Therefore, the chancellor's finding that there was an oral contract was manifestly wrong.

2.

The second reason why this case should be reversed is that the policy issued by appellant contained a valid provision that no agent could change the policy, nor could the policy be changed except by endorsement.

The policy dated April 10, 1959 did not provide any coverage on hired trucks. An endorsement attached to the original policy specifically excluded such coverage. Section 16 of the policy provided as follows:

"16. CHANGES. Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop the company from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy."

"Parties to an insurance contract may stipulate that its terms cannot be waived or changed, except in writing. Provisions that no waiver or alteration in the policy terms should be effective unless made in writing and attached to or endorsed upon the policy are, therefore, generally considered valid and binding upon the insured, in the absence of contrary provisions of a statute." 16 Appleman, Sec. 9208, page 757.

As already noted, Mr. Bush had read the policy and knew all its terms. In New York Life Ins. Co. v. O'Dom, 100 Miss. 219, 56 So. 379, the Court was dealing with a provision in policy providing: "No agent is authorized to waive forfeitures, or make, modify or discharge contracts, or extend the time of paying a premium." The agent in that case was held to be a collecting agent without power to modify the contract of insurance. The Court said: "We see no reason why a corporation, which necessarily contracts through agents, but may have agents of superior or inferior authority, should not stipulate, in any contract executed in its behalf,

that its provisions can be varied by no notice or representations not brought home to the actual knowledge of one of its principal officers, nor any waiver not authorized by them. The stipulation in the policy that 'no agent has power to modify the terms of the contract, or waive its conditions, is notice to the insured of the limited authority in these respects, and under such a stipulation the insured cannot rely upon any actual conduct of the agent as constituting a modification or waiver.' '' This quotation was repeated in the recent case of American National Ins. Co. v. Walters, 230 Miss. 616, 93 So. 2d 616. This rule is firmly a part of the law of this State. It does not conflict with the rule upholding oral contracts of insurance.

It is shown in another part of this dissent that Whitsett was not a general agent. In connection with the application of the two cases cited above, the courts recognize that there is a fundamental difference between a waiver of forfeiture and the extention of the coverage of a policy after it is written and delivered. A statutory agent cannot extend the coverage once the policy is written so as to vary the terms of the policy, except, of course, by written endorsement. The landmark case of Saucier v. Life and Casualty Ins. Co., 189 Miss. 693, 198 So. 625, recognized the validity of provisions of an insurance policy limiting the authority of an agent.

Even a statutory agent cannot extend the coverage of the policy contrary to its terms. New York Life Ins. Co. v. O'Dom, supra, has been cited in the following cases: Home Mutual Fire Ins. Co. v. Pittman, 111 Miss. 420, 71 So. 739; Germania Life Ins. Co. v. Bouldin, 100 Miss. 660, 56 So. 609, wherein the Court said, ''In the absence of any fraud in the making of any insurance policy, the insured must be held to the knowledge of conditions of his policy, as he would be in the case of any other contract or agreement. It certainly would be inequitable and inconsistent with every safe, sound rule

of conduct to permit one party to a contract to accept without examination a written contract, and to lay it aside for a long period of time, and then, when the period of termination is about to expire, to for the first time inform himself of its terms. It shocks the conscience and is at variance with every known rule of business." (Since Bush knew every detail of the policy in the present case, he is bound more firmly by the terms of the policy than if he had merely laid it aside); in Hartford Fire Ins. Co. v. Clark, 154 Miss. 418, 122 So. 551, which is interesting because it clearly points up the difference between the authority of an agent to waive provisions of the policy in the process of consummating the transaction and the authority of agents to waive or alter the provisions of the policy after the policy has been delivered and the contract has been consummated, a question at the very heart of this case; in Springfield Fire & Marine Ins. Co. v. Nix, 162 Miss. 669, 138 So. 598, and in White v. Standard Life Ins. Co., 198 Miss. 325, 22 So. 2d 353, wherein the Court said: "The effort here is to create, by oral representation, a liability expressly excepted in the policy, and base recovery on the liability so created. This cannot be done, as here attempted."

3.

A third reason why this case should be reversed and rendered is that the acts, statements, promises, or knowledge of an agent, even a general agent, cannot extend the coverage of an insurance policy or create a primary liability.

There has been a great deal of misunderstanding as to the authority of an agent. Since this Court decided Saucier v. Life & Casualty Co., supra, in 1940, this Court has recognized that once the policy has been issued and the contract of insurance consummated the statute does

not authorize an agent to change the terms of a policy or to create new liability.

In the case at bar nothing was said about coverage on hired trucks prior to the issuance of the policy in question, and the policy was issued without providing such coverage, as heretofore stated. The negotiations referred to in the majority opinion and in this dissent for hired truck coverage came after the policy had been issued by the company and countersigned as required by Code Sec. 5719 and delivered to the insured, the appellee. What the appellee sought by this suit was to extend the coverage of this policy to hired trucks which were specifically excluded from the terms of the policy. And they seek to do this by means of statements of an alleged agent, resting in parol. We have three recent cases holding directly to the contrary. In Frank Gardner Hdw. & Supply Co. v. St. Paul F. & M. Ins. Co., 148 So. 2d 190, the Court said: "First, the doctrines of waiver and estoppel cannot be used to extend the coverage of an insurance policy or create a primary liability but may only affect rights reserved in it. An insurance contract, under the guise of waiver, cannot be reformed to create a liability for a condition or employee excluded by the specific terms of the policy."

In the case of Employer's Fire Ins. Co. v. Speed, 242 Miss. 341, 133 So. 2d 627, this Court held that waiver and estoppel can only be applied when the subject matter is within the terms of the existing policy and cannot operate to cover additional property. In that case the Court pointed out that waiver and estoppel cannot operate so as to bring within the coverage of the policy, property or loss, or a risk, which by the terms of the policy, was expressly excepted or otherwise excluded. That case, as do the others, recognize that an insuror may be estopped by its conduct or knowledge from insisting on a forfeiture of a policy, but the coverage or

restrictions on the coverage cannot be extended by the doctrines of waiver or estoppel.

Probably the most significant case in this connection is Hartford Accident & Indemnity Co. v. Lockard, 239 Miss. 644, 124 So. 2d 849. In that case the automobile liability policy was issued January 26, 1959. The insured owned a 1953 Ford truck which was covered by Hartford's liability policy. The insured used this truck to pull a log trailer also owned by insured. When the policy was issued, the duly authorized agent of Hartford told the insured that the policy covered his trailers that would be attached to the trucks insured under the policy. Actually the policy as issued specifically excluded any vehicle while towing any trailer owned or hired by insured and not covered by like insurance in the company.

This Court reversed the action of the trial court and held that the demurrer of the defendant should have been sustained. Actually there is no difference in principal in the case at bar and the Lockard case, except that the Lockard case is much stronger on the facts because there was no question there but that the agent assured Lockard that the policy covered the truck while towing the trailer. In the present case, able counsel for appellees used the word "estoppel" only once in the declaration and do not rely on waiver and estoppel by name, but if appellees have a case it must be based on the doctrines of waiver or estoppel. The policy on which they sued specifically excluded coverage of hired trucks. Appellees, in substance, contend that appellant is estopped from relying on the terms of the policy because of statements, acts, and knowledge of the alleged agent. That is the same situation that existed in the Lockard case, where the Court said:

"It is well settled that conditions going to the coverage or scope of a policy of insurance as distinguished from those furnishing a ground for forfeiture may not be waived by implication from conduct or action. The rule

is that while an insuror may be estopped by its conduct or its knowledge from insisting upon a forfeiture of a policy, the coverage or restrictions on the coverage cannot be extended by the doctrine of waiver or estoppel. . . . .

"This is a case where the coverage is sought to be extended. The doctrine of waiver cannot be invoked to create a primary liability and bring within the coverage of the policy risks not included or contemplated by its terms."

The above quotation from the Lockard case first appeared in Carnes & Co. v. Employers Liability Assurance Corp. (C.C.A. 5th), 101 F. 2d 739. It should be recalled that the agent in the Lockard case was a general agent.

The whole line of cases cited in this part of the brief follow the leading case of Maryland Casualty Co. v. Adams, 159 Miss. 88, 131 So. 544, a case which has been cited, quoted from, and approved by the Lockard case and other recent cases. In the Adams case, the insured informed the general agent of the company "that he desired to obtain a policy which would protect him against accidents on his outfit, a new 3/4 Ton International truck and trailer," and told the agent that he was going to use the outfit to haul logs and lumber. The agent drew up a policy and handed it to the insured, saying, "This is what you want, and this will protect you against damage to third persons on account of injuries that may accrue in the operation of this outfit." The policy in question specifically excluded any vehicle covered thereby while used for towing or for propelling any trailer or any vehicle used as a trailer. The truck with the trailer attached became involved in an accident and the question was whether because of the oral assurance of the agent, the insurance company was estopped to set up the provisions of the policy which were in direct conflict with the oral promises of the agent. In holding there was no liability under the policy, and that the

truck described therein was not covered while drawing the trailer, the Court said:

"There is not here involved merely a forfeiture provision of the policy contract, which it is sought to avoid by reason of the acts of an agent of the insurance company constituting a waiver thereof, but it is sought to make by waiver, a contract for the parties which they never made themselves, and by waiver to extend the contract to cover vehicles not covered thereby. . . . ."

The proposition asserted in this part of this dissent is not inconsistent with the validity of an oral contract of insurance. Apparently the majority have not considered the fact that no matter what authority the agent has his statements, acts or promises cannot vary the terms of the policy so as to bring within the coverage of the policy property or risks not included in the policy. Of course, an agent can waive forfeiture, but the fundamental problem here is the difference between the waiver of a forfeiture and the extension of the coverage of the policy. Our authorities are unanimous in holding that the oral promises, statements or acts of an agent cannot extend the coverage of a policy. Whatever else it may be called by the appellees, that is what the appellees sought to do in this case. The alleged oral promises of Whitsett is the sole basis of extending the coverage of the policy to cover vehicles specifically excluded therefrom.

The majority opinion says that Maryland Casualty Co. v. Adams, supra, is not applicable because no complaint was made of the absence of the promised coverage under the policy until four months later, after the accident had occurred. The majority says that in the Lockard case there was also a similar delay. But the same thing is true in the case at bar. The policy was issued in the present case on April 10, 1959, and delivered to the insured about May 1, and the last dis-

cussion about hired car coverage was on May 14, 1959. Bush, the partner who looked after the insurance for appellees, admittedly having carefully read the policy and all endorsements attached thereto as they were later received, kept the policy without complaint more than five months, knowing all the time that the hired truck coverage was not provided therein but was, in fact, specifically excluded.

4.

A fourth reason why this case should be reversed and rendered is the fact that there is no proof that Whitsett or Multiple Peril Underwriters, Inc., had any authority to make an oral contract of insurance on behalf of appellant. It is necessary to dispose of any inference that might be drawn that either Whitsett or Multiple Peril was an agent within the meaning of Code Sec. 5706. Counsel for appellees, in their brief, state that "We did not rely upon Sec. 5706, Miss. Code of 1942, in the lower court as stated by counsel, . . . . nor do we rely upon it here." The statute being disposed of, the agency must be established according to the principles of common law. Old Colony Ins. Co. v. Fagan Chev. Co., 150 So. 2d 172.

In my opinion, there is not a scintilla of evidence that Whitsett or Multiple Peril had any actual authority to enter into an oral contract of insurance. The burden to prove agency was on appellees. The President of Multiple Peril testified that Multiple Peril did not have the authority to issue policies, much less oral policies. Isolated statements of his testimony do not serve to establish an agent. It must be conceded, of course, that if Multiple Peril was an agent, it followed that Whitsett was also, and our cases so hold.

Since there is no proof of actual authority on the part of Multiple Peril to enter into any alleged oral contract, then the only way to establish agency is to

show apparent authority to make a special contract of insurance. In American Bankers Ins. Co. v. Lee, 161 Miss. 85, 134 So. 836, this Court said:

"In this case the burden of showing some reasonable basis for the plaintiff that Lee had a right to think that the agent, Hunt, had apparent authority to make a special contract of insurance must be met.

"(4) 'No presumption exists, however, that the company's agents have authority to make a parol contract to insure; such authority must be proved affirmatively. Of course, a parol contract to issue or renew a policy must be clearly established.' See 2 Couch. Cyc. of Ins. Law, 1929, 1586; also, Joyce on Insurance, vol. 2, p. 1298, sec. 525; 2 Couch. Cyc. of Ins. Law, 1485; 32 C. J. 1067, 1116.

"(5) Appellee suggests to the court that section 5196, Code of 1930, defining who is an agent in this state, might be applied to the case at bar. However, he realizes that this court has said, in effect, that this statute does not alter the general law of agency, and has always recognized the distinction between a special agent, or merely soliciting agent, and an agent clothed with such authority as by implication the principal was bound by his acts. The O'Dom and Hall cases were decided in the light of the substance of this statute, which, so far as material here, has been in force in this state since the Code of 1892. See Section 2327, Code 1892. . . . . . .

"(3) In the case of Germania Life Ins. Co. v. Bouldin, 100 Miss. 660, 56 So. 609, 613, this court said: 'The powers possessed by agents of insurance companies, like those of any other corporation or of an individual principal, are to be interpreted in accordance with the general law of agencies. No other or different rule is to be applied to a contract of insurance than is applied to other contracts.' . . . . .

"(2) . . . . . The burden of proof is upon him who asserts it to show either a direct authorization of

an agent, or by proving such facts or circumstances, or such a course of conduct, as by implication it can be presumed that the agent was acting within the real or apparent scope of his authority. If one invests another with real authority, he is bound by reason of the actual power conferred. If, however, he clothes him with apparent authority, he is bound, because he has induced others to deal with him as an agent. The one rests upon a fact; the other upon a supposed fact. But before the alleged principal is precluded from denying the existence of the supposed fact, it is necessary that the other party should show that he was misled, not by the alleged agent, but by the principal. See New York Life Ins. Co. v. O'Dom, 100 Miss. 219, 56 So. 379, Ann. Cas. 1914A, 583.''

On the question of whether Whitsett and Multiple Peril had apparent authority, much is said about some of the endorsements attached to the policy being countersigned and issued at Jackson, Mississippi, and ·signed by either Whitsett or Multiple Peril. This did not appear on the policy itself, which shows only that it was countersigned at Jackson. In my opinion, the fact that some of the endorsements had ''Countersigned and Issued at Jackson, Mississippi,'' thereon is no justification for the appellees assuming therefrom that the agent had special authority to enter into an oral contract of insurance. Sec. 5719, Miss. Code of 1942, requires that every policy of insurance be countersigned by a local agent. Actually, the policy in this case appears conclusively to have been written by the home office of appellant because the cover letter of transmittal is in the record.

Another reason why appellees cannot contend that they were justified in supposing that Whitsett had authority to enter into an oral contract is the fact that the record does not justify any finding that appellees were misled by any appearance of authority on the part

of said alleged agents. In fact, appellees did not attempt to prove directly or inferentially that they were misled by any alleged apparent authority of the agents.

*Kyle and Ethridge, JJ.,* join in this dissent.