# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CA-01674-SCT

*EDDIE SIMMONS AND CHRISTI SIMMONS*

*v.*

*MARVIN JAGGERS*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/21/2004 |
| TRIAL JUDGE: | HON. JACQUELINE ESTES MASK |
| COURT FROM WHICH APPEALED: | LEE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | DEEDY BOLAND |
| ATTORNEY FOR APPELLEE: | GARY L. CARNATHAN |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 10/27/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE COBB, P.J., CARLSON AND DICKINSON, JJ.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.     A husband and wife claim that, prior to their wedding day, the father of the prospective bride orally agreed to oversee the construction of their marital home as a wedding gift. The father of the bride claims his daughter and son-in-law promised to pay him a $20,000 fee for his services when the home was sold. Later, when the house was to be sold, the couple denied the agreement to pay the fee, prompting the father to file a construction lien on the home. The couple responded by filing suit to extinguish the lien. Not the least bit intimidated by the suit, the father countersued his daughter and son-in-law for breach of an oral construction contract. Apparently finding the whole matter a bit cumbersome, the parties agreed to transform the litigation into a simple declaratory judgment action before Chancery Court Judge Jacqueline

Estes Mask of Lee County. Judge Mask, seeking (as did King Solomon) to learn the truth and reward the righteous, conducted a trial and determined the parties had indeed entered a valid, enforceable, oral contract, and that the father was entitled to the fee.

¶2. Unlike the decisions of King Solomon, a Mississippi trial court's decision may be appealed. And so, we must review this case. Though the learned chancellor's decision was less novel than Solomon's threat to split the baby, we find it was nonetheless wise and correct. We affirm.

## BACKGROUND FACTS AND PROCEEDINGS

¶3. Shortly before Eddie and Christi Simmons were married, they considered purchasing a home. Christi called her father, Marvin Jaggers, to inspect a house in which they were interested. Unimpressed with the house, Jaggers discussed with the couple the idea of building a house. The Simmonses obtained a $115,000 construction loan and purchased a lot. Jaggers supervised the construction and completed the house, and the Simmonses moved in.

*Jaggers's version of the facts*

¶4. Jaggers claims when Eddie and Christi were looking at houses to buy, they told him they would rather build a house, and then sell it and use the profit to purchase a condo in Florida. They told him "if [he] would build the house for them at cost, then they would give [him] $20,000 for [his] labor and time when the house was sold." After Eddie and Christi had lived in the house for approximately a year and a half, they told Jaggers they were going to Florida to look for a condo. When they returned, Christi informed him they had found one. Jaggers says he then went to the house to talk with the couple about sale of the house and payment of

the $20,000. Eddie stated that they could not purchase the condo because he had "lost a lot of money in Tunica." Eddie nevertheless promised to pay Jaggers the $20,000.

¶5. Concerned about the money Eddie lost, Jaggers obtained a title search on the house and learned that three weeks after the closing a second lien had been filed to secure payment of a $15,364 loan. Shortly after Jaggers confronted Eddie with this information, Eddie called to tell him the $20,000 would not be paid. This prompted Jaggers to place a construction lien on the house. When Eddie and Christi learned of the construction lien, they filed suit to have it removed, and Jaggers counterclaimed for the $20,000.

*The Simmonses' version of the facts*

¶6. The Simmonses' story is somewhat different. They claim Jaggers offered to build the house as a wedding gift, and they deny ever making any agreement to pay him $20,000 upon sale of the house. Eddie says when Jaggers learned that the house was going to be sold, he demanded $20,000 be put aside to "put on another house" and to make sure Eddie didn't "do something with it." Eddie says when he told Jaggers, in effect, to mind his own business, Jaggers placed the lien on the house.

¶7. The house sold for $175,000, yielding a profit of approximately $50,000. At trial, Jaggers claimed $20,000 of that profit was owed to him, and the remaining profit of approximately $30,000 was intended as a wedding gift. The Simmonses claimed all the profit belongs to them. The chancellor found the parties had entered a binding oral contract, and she awarded a $20,000 judgment to Jaggers, from which the Simmonses now appeal.

**ANALYSIS**

¶8.     The standard which governs our review of this case is whether the chancellor's determinations were supported by substantial evidence. ***Ezell v. Williams***, 724 So. 2d 396, 397 (Miss. 1998). We seldom disturb a trial court's findings of fact, and then, only when those findings are clearly erroneous. ***Crowe v. Smith***, 603 So. 2d 301, 305 (Miss. 1992). "Put another way, this Court ought and generally will affirm a trial court sitting without a jury on a question of fact unless, based upon substantial evidence, the court [is]   manifestly wrong." ***Yarbrough v. Camphor***, 645 So.2d 867, 869 (Miss. 1994) (citing ***Tricon Metals & Servs., Inc. v. Topp***, 516 So.2d 236, 238 (Miss. 1987); ***Brown v. Williams***, 504 So.2d 1188, 1192 (Miss. 1987)).

¶9.     The Simmonses' only issue on appeal is whether the chancellor's decision was supported by substantial evidence. They say the chancellor's findings of fact and conclusions of law were insufficient, but they do not say what relief they request from this Court. We assume they wish us to either reverse and render the decision of the chancery court or remand for additional findings of fact and conclusions of law.

*Murphree v. W. W. Transportation (Murphree I)*

¶10.    The Simmonses argue that the evidence here is no stronger than that presented in ***Murphree v. W.W. Transportation***, 797 So. 2d 268 (Miss. Ct. App. 2001), in which the Court of Appeals found the evidence "too speculative to establish the existence of a binding oral contract." We find the Simmonses' reliance on ***Murphree I*** misplaced. In that case, Jason Murphree claimed that Tim Weatherford, while serving as acting president of W. W. Transportation, orally agreed on behalf of the company to repay a series of loans Murphree purportedly made to the company. At some point, Murphree became president of the company

4

and he instructed the company's accountant to prepare back-dated promissory notes to substantiate the purported loans. When Murphree later sued on the back-dated notes, the company refused to pay. The trial court, finding the notes invalid, held for the company. The Court of Appeals reversed, holding that the trial court should have concentrated on the question of whether a debt existed, rather than the validity of the notes. The Court of Appeals remanded for further factual determinations.

*Murphree v. W. W. Transportation (Murphree II)*

¶11. On remand the trial court found no valid debt existed. Murphree again appealed and, in upholding the decision of the trial court, the Court of Appeals, stated:

> In his order following the remand hearing, the trial judge stated, "The Court has paid close and particular attention to the witnesses. Has taken into account their respective interest in the outcome, and their relationship to the central parties in this matter and does hereby find that no credible, believable testimony or evidence was introduced to convince the Court that the alleged promissory notes were valid and binding loan transactions between Weatherford and Murphree, or between W.W. Transportation and Jason Murphree." The trial judge found Weatherford's testimony to be inconsistent and Overall's[1] to be unreliable. Although we may have reached a different conclusion, we cannot say that the trial judge's findings were clearly erroneous or not supported by substantial evidence.

*Murphree v. W.W. Transp.*, 878 So. 2d 241, 243 (Miss. Ct. App. 2004).[2]

¶12. Thus, the Court of Appeals' decisions in *Murphree I* and *Murphree II* are of no help to the Simmonses. *Murphree I* is inapposite, and *Murphree II* simply recognized the appropriate deference due to a chancellor's decision.

---

[1]Overall was the accountant who prepared the back-dated promissory notes.

[2]We note with interest that, although both parties cited and argued *Murphree I*, neither party cited *Murphree II*.

¶13. This Court has never held that oral contracts are inferior to, or less enforceable than, written contracts. In fact, this Court has specifically held:

> As a general rule, Mississippi law does not require that contracts be made in writing. Put otherwise, oral contracts are ordinarily no less enforceable than others. *See, e.g.,* **Short v. Columbus Rubber and Gasket Co**., 535 So.2d 61, 64 (Miss.1988); **Eastline Corp. v. Marion Apartments, Ltd**., 524 So.2d 582, 584 (Miss.1988); **St. Louis Fire and Marine Insurance Co. v. Lewis**, 230 So.2d 580, 582 (Miss.1970); **Canal Insurance Co. v. Bush**, 247 Miss. 87, 154 So.2d 111, 119 (1963).

**Putt v. City of Corinth**, 579 So. 2d 534, 538 (Miss. 1991).

¶14. When a trial judge sits as the finder of fact, he or she has the sole authority to determine the credibility of witnesses. **Yarbrough v. Camphor,** 645 So.2d at 869 (citing **Bryan v. Holzer**, 589 So.2d 648 (Miss. 1991); **Bell v. Parker**, 563 So.2d 594 (Miss. 1990)). In this case, we find in the record substantial evidence which supports the chancellor's decision.

¶15. Just before Eddie and Christi wed, they considered buying a house which they asked Jaggers to inspect and give them his opinion. Jaggers inspected the house and found some problems prompting him to advise the couple not to go forward with the purchase. Later, Eddie and Christi approached Jaggers to discuss building a house. According to Jaggers, the Simmonses wanted to build the house, sell it for profit, and use the profit to purchase a condo in Florida. Jaggers testified that he orally agreed with Christi and Eddie to build a house for them at cost, provided that when the house was sold, they would give him $20,000 for his labor and time.

¶16.  Jaggers testified that the cost of building the house was approximately $115,000[3] and that a new house with a construction cost should have sold for around $180,000.  Thus, if he were a general contractor building this particular house, he would have made approximately $60,000 to $65,000, but he agreed to do it for $20,000 because the house was for his daughter.  Jaggers hired subcontractors, including his son, Jeff Jaggers, who was a builder or carpenter.  Jaggers testified that the Simmonses took out a construction loan of $115,000 and that it took about six to eight months to build the house.

¶17.  Jaggers further testified that he expected to receive his money when the Simmonses sold the home and that Christi told him a woman from California had put up the money to buy the house.  According to Jaggers, Christi told him that she and Eddie had found a condo in Florida.  Jaggers went over to the Simmonses' house and asked Eddie about the condo in Florida.  Eddie told him that they could not afford a condo because he had lost a lot of money gambling in Tunica.  Jaggers testified that Eddie then reaffirmed the promise to pay him for building the house.

¶18.  Wondering how much Eddie was in debt, Jaggers had an attorney examine the title of the house.  The title search revealed that about three weeks after the house was completed and closed, Eddie had borrowed $15,364 against the home.  Jaggers confronted Eddie who said the money was to pay back taxes.  Jaggers asked Eddie if he thought it was fair to borrow $15,000 against the house Jaggers had built for his daughter. Eddie replied it was and Jaggers would still

[3]Although there was some confusion in Eddie's testimony, the record clearly establishes that the $115,000 included the cost of the land.

get his money. However, Eddie later called Jaggers and told him he would not get a dime, prompting Jaggers to file a lien.

¶19.  Christi's brother, Jeff, testified that he worked on the Simmonses' house at the request of his father. During the construction of the home, Jeff heard his father and Eddie talking about how Jaggers would be paid $20,000 for his services out of the proceeds from the sale of the house. Jeff also stated that, in his opinion, a contractor would normally charge more than $20,000 to build this house. Jeff stated he had never heard his father say the house was a gift.

¶20.  In light of the record, we find the chancellor did not commit manifest error in determining that an oral contract existed between the parties. It was the chancellor's duty to evaluate the credibility of the witnesses. Jaggers's testimony, which was corroborated by the Christi's brother, Jeff, clearly established an oral contract. The evidence contradicting Jaggers's claim was primarily the testimony of Eddie and Christi Simmons, which the chancellor apparently did not find credible. Furthermore, the Simmonses contradicted each other on at least one point. Eddie testified that he and Christi never considered buying a condo in Florida, while Christi testified that they did and in fact had been to Florida to look at condos. While perhaps a small point, this inconsistency further supports the chancellor's evaluation of the witnesses' credibility.

## CONCLUSION

¶21.  Finding no reversible error, we affirm the judgment of the Chancery Court of Lee County.

¶22. **AFFIRMED.**

       **SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY, CARLSON AND RANDOLPH, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. DIAZ, J., NOT PARTICIPATING.**