# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2024-CA-01277-SCT

*ANDREW MALLETTE, M.D. AND THE
SURGICAL CLINIC ASSOCIATES, P.A.*

*v.*

*NITKIA RHEA REVETTE, IN HER CAPACITIES
AS PERSONAL REPRESENTATIVE OF
MITCHELL GLENN REVETTE FOR THE
BENEFIT OF ALL WRONGFUL DEATH
BENEFICIARIES, AND AS ADMINISTRATRIX
OF THE ESTATE OF MITCHELL GLENN
REVETTE, DECEASED*

DATE OF JUDGMENT:             10/16/2024
TRIAL JUDGE:                  HON. WINSTON L. KIDD
TRIAL COURT ATTORNEYS:      WILLIAM MONROE QUIN, II
                                   TIMOTHY LEE SENSING
                                   BRIANA ANTOINETTE O'NEIL
COURT FROM WHICH APPEALED:  HINDS COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANTS:    TIMOTHY LEE SENSING
                                   BRIANA ANTOINETTE O'NEIL
ATTORNEYS FOR APPELLEE:      WILLIAM MONROE QUIN, II
                                   W. THOMAS McCRANEY, III
NATURE OF THE CASE:          CIVIL - WRONGFUL DEATH
DISPOSITION:                  AFFIRMED AND REMANDED - 03/26/2026
MOTION FOR REHEARING FILED:

**BEFORE COLEMAN, P.J., ISHEE AND BRANNING, JJ.**

**COLEMAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    Dr. Andrew Mallette and The Surgical Clinic Associates, P.A., appealed from an order of the Hinds County Circuit Court denying their motion to compel arbitration in a wrongful-death medical-negligence action. The circuit court found that Mitchell Glenn Revette did not sign the arbitration agreement and that his wife, Nitkia Revette, lacked

authority to sign on his behalf.  The court therefore held that the arbitration agreement was unenforceable and denied arbitration.  Because the Court is compelled to give deference to the circuit court's findings of fact, we affirm.

## FACTS

*Underlying Dispute*

¶2.     On June 8, 2021, Mitchell went to the emergency room at Baptist Medical Center complaining of abdominal pain.  He was treated by Dr. Mallette, a physician with The Surgical Clinic Associates, P.A.  A CT scan revealed diverticulitis and a perforated colon. After a few days of more conservative treatment, Mallette performed a Hartmann's procedure[1] with colostomy on Mitchell on June 10, 2021.  Mitchell was discharged on June 19.

¶3.     Mitchell returned to Baptist on January 13, 2022, for a reversal of the colostomy, which Dr. Mallette performed.   During recovery, Mitchell's breathing slowed and, eventually, he died from lack of oxygen to his brain on January 15, 2022.

¶4.     On September 1, 2022, Nitkia filed suit as a wrongful-death beneficiary and on behalf of Mitchell's estate, alleging six counts of medical negligence and lack of informed consent. Nitkia alleges that the anesthesia and post-surgical painkilling procedures were negligent and resulted in advancing sedation and opioid-induced respiratory depression, which directly led to Mitchell's death.

---

[1]A Hartmann's procedure is a colorectal operation commonly performed for perforated diverticulitis, in which a diseased segment of colon is removed, the rectal stump is closed, and the proximal colon is brought out as an end colostomy.

*Arbitration Agreement*

¶5. Mallette and the Clinic filed a motion to compel arbitration on October 17, 2022. A hearing on the motion was held on February 13, 2023, at which the court heard testimony from Nitkia and two employees of the clinic, Donna Dennery and Amanda McFarland.

¶6. The Clinic had mailed an intake packet that included the disputed arbitration agreement to Mitchell. Mitchell's signature was placed on the agreement on July 1, 2021, three weeks after his initial care but prior to his follow-up in January. The arbitration agreement bears the signature "Mitchell Revette," with initials "MR" next to a clause stating that the person signing on behalf of the patient attests that he or she has authority to execute the agreement.

¶7. At the hearing, Nitkia testified that she signed Mitchell's name on the arbitration agreement and confirmed that the signature appearing on the arbitration agreement was her handwriting. She testified that when she received the paperwork, she called the Clinic, and they told her to fill it out and sign it.

¶8. Nitkia acknowledged that she recognized both her own handwriting and her husband's handwriting on various documents in the packet. She testified that she completed the arbitration form and dated it. She confirmed that Mitchell was not present with her when she signed the form. No one from the Clinic ever discussed the arbitration agreement with her or her husband.

¶9. Nitkia's affidavit averred that she did not have authority to sign the arbitration agreement on her husband's behalf. She testified that it was not uncommon for her to sign

3

documents for him throughout their marriage. She "mainly filled his paperwork out because he did not read or write very well[.]"

¶10. Nitkia provided the court with an example of her signing her name and her husband's name. No handwriting expert testified at the hearing. No witness testified that the signature on the arbitration agreement was forged by a third party.

¶11. Donna Dennery, the Clinic's office manager, averred in her affidavit that staff were trained to require the patient and not a family member to execute intake documents, including the arbitration agreement. She claimed that the Clinic would not accept an arbitration agreement bearing anyone else's signature and would not treat a patient who refused to sign. Amanda McFarland, a receptionist, likewise testified by affidavit that she had never instructed a family member to sign intake paperwork for a patient and that patients were required to execute the forms themselves.

¶12. On October 16, 2024, the trial court entered an order denying Dr. Mallette and the Clinic's motion to compel arbitration. It found that "Mitchell Revette did not sign the Arbitration Agreement [and] that Nitkia Revette did not have the authority to sign the agreement on behalf of Mitchell Revette, and therefore, the arbitration agreement is not enforceable."

¶13. Dr. Mallette and the Clinic appeal from the order denying their motion to compel and raise three issues:

(1)     The trial court erred by finding the signature was not Mitchell's.

(2)     Even if Nitkia signed her husband's signature, the trial court erred by not finding that she had authority to do so.

4

(3)     Under direct-benefits estoppel law, the trial court erred by not enforcing the arbitration agreement.

## STANDARD OF REVIEW

¶14.   "[T]his Court ought and generally will affirm a trial court sitting without a jury on a question of fact unless, based upon substantial evidence, the court must be manifestly wrong." *Transocean Enter., Inc. v. Ingalls Shipbuilding, Inc.*, 33 So. 3d 459, 462 (¶ 7) (Miss. 2010) (internal quotation marks omitted) (quoting *Yarbrough v. Camphor*, 645 So. 2d 867, 869 (Miss. 1994)).   "The word 'manifest,' as defined in this context, means 'unmistakable, clear, plain, or indisputable.'" *Id.* (internal quotation marks omitted) (quoting *Singley v. Singley*, 846 So. 2d 1004, 1007 (Miss. 2002)).

¶15.   "The grant or denial of a motion to compel arbitration is reviewed de novo." *E. Ford, Inc. v. Taylor*, 826 So. 2d 709, 713 (¶ 9) (Miss. 2002) (citing *Webb v. Investacorp, Inc.*, 89 F.3d 252, 256 (5th Cir. 1996)).   "When determining whether a valid arbitration agreement exists, we employ ordinary principles of contract law." *Harrison Cnty. Com. Lot, LLC v. H. Gordon Myrick, Inc.*, 107 So. 3d 943, 950 (¶ 15) (Miss. 2013) (citing *Terminix Int'l, Inc. v. Rice*, 904 So. 2d 1051, 1055 (¶ 9) (Miss. 2004)).

## ANALYSIS

### I.     Authenticity of the Signature

¶16.   In determining the validity of an arbitration agreement, a trial court applies a two-pronged inquiry. "The first prong has two considerations: (1) whether there is a valid arbitration agreement and (2) whether the parties' dispute is within the scope of the arbitration agreement." *Taylor*, 826 So. 2d at 713 (¶ 9).   "Under the second prong,

5

applicable contract defenses available under state contract law such as fraud, duress, and unconscionability may be asserted to invalidate the arbitration agreement without offending the Federal Arbitration Act." *Id.* (¶ 10) (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686 (1996)).

¶17.    In the case *sub judice*, Nitkia argues that only the first consideration of the first prong is applicable—whether the arbitration agreement is valid.  Dr. Mallette and the Clinic argue that the dispute falls under the second prong—that Nitkia is essentially alleging fraud.  If the dispute is under the first consideration of the first prong, then the burden falls on the party seeking enforcement of the agreement to prove by a preponderance of the evidence to the trial court that the agreement is valid.  *Trinity Mission Health & Rehab of Holly Springs, LLC v. Lawrence*, 19 So. 3d 647, 652 (Miss. 2009) (quoting *Mariner Healthcare, Inc. v. Green*, No. 4:04CV246, 2006 WL 1626581, at *1 (N.D. Miss. June 7, 2006))  If the dispute is under the second prong, the burden shifts to the party against whom enforcement is sought to prove by clear and convincing evidence that fraud or another contract defense occurred. *Cotton v. McConnell*, 435 So. 2d 683, 686 (Miss. 1983) (citng *McMahon v. McMahon*, 157 So. 2d 494, 501 (Miss. 1962)).

¶18.    The Court holds that the debate over the proper burden of proof is ultimately immaterial because of a gap in the record.  The two argued standards apply to the trial court's determination of existence of a binding arbitration agreement, but nowhere in the order or in the transcript of the hearing did the trial judge declare *which standard* he used to make his factual findings.  "We cannot consider evidence that is not in the record." *Pratt v. Sessums*,

6

989 So. 2d 308, 309-10 (¶ 6) (Miss. 2008) (citing *Shelton v. Kindred*, 279 So. 2d 642, 644 (Miss. 1973)). The Court presumes that a trial judge applied the law correctly. The Court, therefore, applies its own standard of review—"affirm . . . on a question of fact unless . . . the court must be manifestly wrong" and presume that the trial court used the correct standard to determine its facts. *Transocean Enter., Inc.*, 33 So. 3d at 462 (¶ 7) (internal quotation mark omitted) (quoting *Yarbrough*, 645 So. 2d at 869).

¶19. The trial court heard testimony from Nitkia admitting that she signed Mitchell's signature. "In a bench trial, the trial judge has sole authority to determine the credibility of the witnesses." *Bell v. Parker*, 563 So. 2d 594, 597 (Miss. 1990) (citing *Rice Researchers, Inc. v. Hiter*, 512 So. 2d 1259, 1265 (Miss. 1987), *abrogated by* *Bluewater Logistics, LLC v. Williford*, 55 So. 3d 148, 157 (Miss. 2011)). The court compared the signatures on documents that were actually signed by Mitchell with the documents Nitkia claimed to have executed on his behalf. The court also required Nitkia to demonstrate her signing of Mitchell's name in the courtroom and compared that example to the signature appearing on the arbitration agreement. Based on the inquiry, the court determined that Nitkia had signed Mitchell's name.

¶20. No evidence in the record compels the Court to hold that the trial judge's finding of fact that Mitchell did not sign the arbitration agreement amounted to manifest error that merits reversal. *Transocean Enter., Inc.*, 33 So. 3d at 462 (¶ 7) (quoting *Singley*, 846 So. 2d at 1007). The Court will "seldom disturb a trial court's findings of fact, and then, only when those findings are clearly erroneous." *Simmons v. Jaggers*, 914 So. 2d 693, 695 (¶ 8)

7

(Miss. 2005) (citing *Crowe v. Smith*, 603 So. 2d 301, 305 (Miss. 1992)). The testimony and signatures in the record amount to "substantial evidence in the record to support" the trial court's findings, thus, the "Court will not disturb [the court's] factual determinations[.]" *Yarbrough*, 645 So. 2d at 869 (citing *Omnibank of Mantee v. United S. Bank*, 607 So. 2d 76, 82 (Miss. 1992)).

¶21. Reversing a trial court's finding of fact is a high bar, and the Court should only do so when the error is "unmistakable, clear, plain, or indisputable." *Transocean Enter., Inc.*, 33 So. 3d at 462 (¶ 7) (internal quotation marks omitted) (quoting *Singley*, 846 So. 2d at 1007). The demanding standard has not been met, and the Court defers to the trial court on its determination that Nitkia signed Mitchell's name.

## II. Authority

¶22. Defendants argue that, even if Nitkia forged her husband's name on the arbitration agreement, Mitchell is bound by the agreement because they claim she had the authority to sign the arbitration agreement on his behalf. The Court has held that the "burden of proving an agency relationship rests squarely upon the party asserting it[.]" *Highlands Ins. Co. v. McLaughlin*, 387 So. 2d 118, 120 (Miss. 1980). Mississippi law recognizes three types of authority that an agent may use to bind a principal: (1) actual authority, (2) implied authority, and (3) apparent authority. *Newsome v. Peoples Bancshares*, 269 So. 3d 19, 28–30 (¶¶ 23–31) (Miss. 2018).

¶23. "Actual authority, also termed express or direct authority, is the authority *actually conferred* by the principal." *Id.* at 28 (¶ 24) (citing *McFarland v. Entergy Miss., Inc.*, 919

8

So. 2d 894, 902 (Miss. 2005)). "The Court has stated: 'An express agent is one who is in fact authorized by the principal to act on their behalf.'" *Id.* (quoting *McFarland*, 919 So. 2d at 902).

¶24.    "Implied agency [or authority] requires that the principal give the agent *actual authorization to perform acts* which reasonably lead third parties to believe that an agency relationship exists." *Id.* at 29 (¶ 29) (alteration in original) (quoting *Forest Hill Nursing Ctr., Inc. v. McFarlan*, 995 So.2d 775, 781 (Miss. Ct. App. 2008)). "[I]mplied authority requires actual authorization for the agent to act[.]" *Id.* Implied authority is a subset of actual authority that "gives the agent the power to 'do that, which would be proper, usual and necessary … in the exercise of his express authority.'" Jeffrey Jackson, Mary Miller, Donald Campbell, et al., *Mississippi Practice Series: Encyclopedia of Mississippi Law* § 4:8 (3d ed.) (database updated Oct. 2025) (alteration in original) (quoting *Migerobe, Inc. v. Certina USA, Inc.*, 924 F.2d 1330, 1336 (5th Cir. 1991)). In other words, if a person has express authority to perform a specific act, that express authority necessarily includes the implied authority to take all reasonable and necessary steps to carry out that act.

¶25.    "Apparent authority exists when a reasonably prudent person, having knowledge of the nature and the usages of the business involved, would be justified in supposing, based on the character of the duties entrusted to the agent, that the agent has the power he is assumed to have." *Id.* at 29 (¶ 31) (internal quotation marks omitted) (quoting *Eaton v. Porter*, 645 So. 2d 1323, 1325 (Miss. 1994)). The Court uses a three-prong test to determine if apparent authority exists: "(1) acts or conduct by the principal indicating the agent's authority; (2)

9

reasonable reliance by a third party upon those acts or conduct; and (3) detrimental change in position by the third party as a result of such reliance." *Id.* at 29-30 (¶ 31) (quoting *Barnes, Broom, Dallas & McLeod, PLLC v. Est. of Cappaert*, 991 So. 2d 1209, 1211 (Miss. 2008)). Additionally, the Court noted that "[w]hether the evidence sufficiently meets the three-prong test of apparent authority is an issue for the fact-finder." *Id.* at 30 (¶ 31) (internal quotation marks omitted) (quoting *Andrew Jackson Life Ins. Co. v. Williams*, 566 So.2d 1172, 1181 (Miss. 1990)).

*Actual and Implied Authority*

¶26.    In her affidavit, Nitkia averred:

> Mitchell Glenn Revette never told me that I had the authority to sign his name to the documents mailed to our home by SCA. In fact, my husband did not know SCA mailed the documents to our home, he did not know the documents existed, and he did not know the content of the documents. I signed the documents because, as I previously stated, a female SCA employee instructed me to sign them.

¶27.    The trial court heard evidence that Mitchell never gave Nitkia permission. The judge was in place to evaluate the credibility of Nitkia's testimony. As the Court has repeatedly held, "[i]t is the role of the trial judge, not the Supreme Court, to resolve conflicts in the evidence, evaluate the credibility of the witnesses, and determine the weight of the evidence." *Phillips v. City of Oxford*, 368 So. 3d 317, 326 (¶ 33) (Miss. 2023) (citing *Univ. Med. Ctr. v. Martin*, 994 So. 2d 740, 746 (¶ 24) (Miss. 2008)).

¶28.    Likewise, implied authority also "requires actual authorization for the agent to act[.]" *Newsome*, 269 So. 3d at 29 (¶ 29). The trial court found that there was no actual authorization for Nitkia to act on behalf of Mitchell. The record does not contain evidence

10

sufficient to overturn the trial court's finding of fact. Accordingly, the Court will defer to the trial court's determination that Nitkia was not given permission by Mitchell and, therefore, lacked both actual and implied authority.

*Actual Authority Conveyed by Silence*

¶29. Even absent any express permission, Dr. Mallette and the Clinic also suggest that, because Mitchell knew Nitkia sometimes signed for him, his silence conveyed actual authority for her to execute the arbitration agreement. Mississippi law does not recognize actual authority on so thin a reed. "Actual authority arises as 'reasonably understood by the agent,'" but it requires a "manifestation by the principal," *i.e.*, "expressive conduct." *Newsome*, 269 So. 3d at 28 (¶ 24) (quoting Restatement (Third) of Agency § 3.01 (2006)). Critically, "[a] principal's unexpressed willingness that another act as agent does not create actual authority." *Id.* (alteration in original) (internal quotation marks omitted) (quoting Restatement (Third) of Agency § 3.01 cmt. b (2006)). Silence, by itself, fits squarely within the category of "unexpressed willingness" that the law deems insufficient. *Id.* (quoting § 3.01 cmt. b).

¶30. The rule is demanding for good reason. Actual authority binds a principal to contractual obligations he has not personally undertaken based on what the principal actually conferred on the purported agent. *Id.* Further, arbitration agreements are inherently consent-based: "because arbitration provisions are contractual in nature, the general rule is that 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Qualcomm Inc. v. Am. Wireless License Grp., LLC*, 980 So. 2d 261, 269

11

(¶ 15) (Miss. 2007) (quoting ***Adams v. Greenpoint Credit, LLC***, 943 So. 2d 703, 708 (Miss. 2006)). To treat silence as sufficient actual authority would invert that principle by allowing a third party to impose a waiver of the judicial forum based not on the principal's manifested consent but on the absence of an objection to paperwork the principal may never have even seen.

¶31.    The record, as found by the trial court, contains no "expressive conduct" by Mitchell authorizing Nitkia to bind him to arbitration. ***Newsome***, 269 So. 3d at 28 (¶ 25). Nitkia testified that Mitchell was not present when she signed, and her affidavit averred he did not know the documents existed. On the evidence, Dr. Mallette and the Clinic's silence theory asks the Court to infer a grant of actual authority from nonaction—precisely what ***Newsome*** rejects. ***Id.*** At most, silence and past household practice might be argued under apparent-authority or estoppel theories, which turn on different elements and a different evidentiary showing. But they do not supply actual authority, which requires an affirmative manifestation by the principal. ***Id.***

¶32.    Accordingly, Dr. Mallette and the Clinic failed to carry their burden to prove that Mitchell conferred actual authority on Nitkia by silence. The trial court's finding that Nitkia lacked authority to execute the arbitration agreement is supported by substantial evidence and warrants deference.

### III.    Direct-Benefits Estoppel

¶33.    Direct-benefits estoppel is an equitable doctrine under which a nonsignatory may be bound to an arbitration agreement when the nonsignatory knowingly seeks and obtains direct

benefits from a contract that contains an arbitration clause. "Direct-benefit[s] estoppel involve[s] non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status, but then, during litigation, attempt to repudiate the arbitration clause in the contract." *Belhaven Senior Care, LLC v. Smith*, 359 So. 3d 612, 617 (¶ 12) (Miss. 2023) (second alteration in original) (internal quotation marks omitted) (quoting *Scruggs v. Wyatt*, 60 So. 3d 758, 767 (Miss. 2011)). "For direct-benefit[s] estoppel to apply, a nonsignatory like [Nitkia] must 'embrace the contract' by either (1) 'knowingly seeking and obtaining direct benefits from the contract; or (2) by seeking to enforce the terms of that contract or asserting claims that must be determined by reference to that contract.'" *Id.* (quoting *Scruggs*, 60 So. 3d at 767).

¶34. Defendants argue that Nitkia is bound by direct-benefits estoppel because:

> Plaintiff's claims on behalf of the Estate are directly dependent on the execution of the subject arbitration agreement. Absent that agreement, Mitchell Revette would not have been treated by Dr. Mallette and SCA, and the Estate's claims herein would not exist. In other words, by bringing this action, Plaintiff is necessarily relying on the treatment rendered to Mitchell Revette which would not have occurred absent the execution of the subject arbitration agreement.

Of the two options for embracing the contract, Dr. Mallette and the Clinic argue under the second option—"asserting claims that must be determined by reference to that contract." *Id.* (internal quotation marks omitted) (quoting *Scruggs*, 60 So. 3d at 767). Their argument is essentially: but for the agreement, Mitchell would not have been treated, would not have died in their care, and Nitkia would not be able to file the wrongful-death and medical-negligence claims.

13

¶35. Dr. Mallette and the Clinic's argument answers a different question than the direct-benefits estoppel standard asks. The second prong asks whether the claim must be determined by reference to the contract; but Dr. Mallette and the Clinic's argument answers whether the claim could exist absent the contract. The questions are fundamentally different.

¶36. The doctrine does not ask whether the Nitkia's tort claims would exist "but for" the fact that a contract was executed at some earlier point in time. It asks whether the nonsignatory has embraced the contract by seeking to enforce it or by asserting claims that depend on the contract's terms for their resolution, *i.e.*, claims whose elements, rights, or duties must be proved by reference to the contract itself.

¶37. Dr. Mallette and the Clinic do not identify any claim element that turns on the arbitration agreement's language, any contractual duty created by that agreement, or any contractual benefit Nitkia is attempting to enforce. Instead, their contention is purely one of cause and effect: absent the arbitration agreement, Mitchell allegedly would not have been treated and absent treatment, there would be no alleged negligence and therefore no lawsuit. That is but-for causation, not an embrace of the contract. It does not show that the Estate's wrongful-death and medical-negligence claims "must be determined by reference to" the arbitration agreement. *Id.* (quoting *Scruggs*, 60 So. 3d at 767).

¶38. Put differently, the claims here arise from alleged breaches of tort duties and are adjudicated under tort standards—standard of care, breach, causation, and damages, none of which requires interpreting the arbitration agreement or proving any right or obligation created by it. The agreement's existence may be part of the timeline of how Mitchell became

14

a patient, but chronology is not "embracing the contract." Direct-benefits estoppel concerns legal dependence on the contract, not factual dependence on the events that preceded the injury.

¶39.    The analysis in *Scruggs*, 60 So. 3d 758, demonstrates the distinction aptly. Derek Wyatt was an attorney with an unwritten employment agreement with Nutt & McAlister, PLLC. *Id.* at 760 (¶ 1). Nutt was a signatory to the Katrina Joint Venture Agreement (JVA), which governed legal roles, funding, and fee sharing between several law firms as they pursued Katrina related suits. *Id.* at 761 (¶ 5). It also contained an arbitration agreement. *Id.* at 760 (¶ 1). Eventually, Nutt withdrew from the JVA, which led to Wyatt suing Nutt in a fee dispute. *Id.* at 763 (¶ 10). The defendants filed a motion to compel arbitration under the JVA arbitration agreement, but the trial court denied the motion because Wyatt was a nonsignatory to the agreement. *Id.* at 765 (¶ 13).

¶40.    On appeal, the Court concluded "that direct-benefit estoppel theory requires the nonsignatory claimant, Wyatt, to arbitrate his claims against the Scruggs Defendants." *Id.* at 771 (¶ 29) (citing *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010)). Wyatt's claims were *legally dependent* on the JVA. *Id.* at 770 (¶ 27). The fees that he alleged he was due were "directly tied to successful recovery by the Katrina Joint Venture against its client's insurers. [And, therefore,] Wyatt's claims . . . are directly dependent on the Katrina JVA, and require reference thereto." *Id.* at (¶ 28) (citing *Noble*, 620 F.3d at 473). Wyatt's pleaded theories (fiduciary duties, fee-sharing-participant status, joint-venture rights/duties, accounting, constructive trust, etc.) were framed so that liability

15

"flowed from" and had to be evaluated by reference to the Katrina JVA as the operative instrument defining the venture's relationships and obligations. *Id.* at 763 (¶ 10), 771 (¶ 29). Wyatt's complaint itself invoked and relied on rights and duties that arose from the contract governing the relationship at issue, so the claims could only be determined by reference to that contract.

¶41. That is not what Dr. Mallette and the Clinic argue in the case *sub judice*. They do not contend that Nitkia's wrongful-death and medical-negligence claims seek to enforce any contractual term or that any claim element requires interpreting the arbitration agreement. Instead, their argument is purely chronological: that absent the arbitration agreement, Mitchell would not have been treated, and therefore the claims would not exist. Unlike *Scruggs*, in which the plaintiff pleaded entitlement and duties that arose from the contract governing the parties' relationship, the claims here arise from tort law and medical standards of care, and they can be resolved without any reference to the arbitration agreement's terms.

¶42. Dr. Mallette and the Clinic's approach would expand direct-benefits estoppel beyond the Court's precedent. Were it enough to say "the injury would not have occurred absent admission paperwork," then virtually any tort claim arising after a person signs intake forms could be forced into arbitration against nonsignatories, regardless of whether the claim depends on any contractual term. "[B]ecause arbitration provisions are contractual in nature, the general rule is that 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Qualcomm Inc.*, 980 So. 2d at 269 (¶15) (quoting *Adams*, 943 So. 2d at 708). The second prong applies only when the plaintiff's claims actually

invoke the contract—seeking to enforce it, obtain benefits under it, or rely on its terms as the source of the right asserted. That is not the case before us.

¶43. The standard for direct-benefits estoppel is not met.

## CONCLUSION

¶44. Because a trial court's factual determinations are afforded great deference, the judgment of the Hinds County Circuit Court denying Dr. Mallette and the Clinic's motion to compel arbitration is affirmed. The case is remanded to the circuit court for further proceedings consistent with our opinion.

¶45. **AFFIRMED AND REMANDED.**

**RANDOLPH, C.J., KING, P.J., ISHEE, GRIFFIS, SULLIVAN AND BRANNING, JJ., CONCUR.**